## CASE NO. 10-4115/10-4116

### IN THE UNITED STATE COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHASE BANK, USA, *et al.* | : | |
| | : | |
| Plaintiff-Appellants, | : | |
| | : | |
| vs. | : | |
| | : | |
| CITY OF CLEVELAND, | : | Appeal from Case No. |
| | : | 08-00514 in the U.S. Dist. |
| Defendant-Appellant. | : | Ct. for the Northern Dist. |
| | : | of Ohio |
| | : | |

### PRINCIPAL AND RESPONSE BRIEF OF
### DEFENDANT-APPELLEE AND CROSS-APPELLANT
### THE CITY OF CLEVELAND

Joshua R. Cohen (0032368)
jcohen@crklaw.com
**Cohen Rosenthal & Kramer LLP**
The Hoyt Block Building – Ste. 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
(216) 781-7956 **(Telephone)**
(216) 781-8061 (**Facsimile**)

Mark A. Stanton (007919)
hollie@mghslaw.com
**Short Shepherd & Stanton**
Rockefeller Building – Ste. 1300
614 Superior Avenue NW
Cleveland, Ohio 44113
(216) 687-0725 **(Telephone)**
(216) 664-6999 **(Facsimile)**

Robert J. Triozzi, Dir. (0016532)
rtriozzi@city.cleveland.oh.us
Gary S. Singletary (0037329)
gsingletary@city.cleveland.oh.us
**City of Cleveland Law Dept.**
Cleveland City Hall
601 Lakeside Avenue- Room 106
Cleveland, Ohio 44114
(216) 664-2800 **(Telephone)**
(216) 664-2663 **(Facsimile)**

# TABLE OF CONTENTS

**Page**

TABLE OF CASES ................................................................. v

TABLE OF OTHER AUTHORITIES ................................................ ix

DESIGNATION OF PARTIES ................................................. 1

STATEMENT REGARDING ORAL ARGUMENT ........................... 2

JURISDICTIONAL STATEMENT.................................................. 3

    I.    District Court Jurisdiction................................................. 3

    II.   Appellate Jurisdiction................................................ 3

    III.  Filing Dates and Timeliness of Appeal and Cross Appeal.... 3

    IV.  Final Appealable Order................................................. 4

ISSUES PRESENTED FOR REVIEW ................................................ 5

    I.    The Appeal.............................................................. 5

    II.   The Cross Appeal...................................................... 6

STATEMENT OF THE CASE................................................... 7

STATEMENT OF FACTS................................................... 8

    I.    The Plaintiffs ......................................................... 8

    II.   The Public Nuisance Lawsuit ...................................... 8

    III.  The State Lawsuit ................................................... 9

    IV.  The Amended Complaint ......................................... 10

        A.   Claim for Declaratory Relief ........................... 10

        B.   Request for Relief ............................................ 11

        C.   Jurisdiction ................................................... 11

    V.   Dismissal of Lawsuit ................................................ 12

        A.   Partial Granting of Motion to Dismiss ........................... 12

        B.   Jurisdiction to Consider Request for Injunction........... 13

        C.   Dismissal without Prejudice ........................... 13

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT...................................................................... 15

   I.   The Appeal........................................................................ 15

        A.   28 U.S.C. § 1343(a)(3)................................................ 15

        B.   42 U.S.C. § 1983 ...................................................... 15

        C.   28 U.S.C. § 1331 ...................................................... 15

        D.   Discretion to Abstain from Hearing Declaratory Judgment Claims ........................................................ 16

        E.   The Anti-Injunction Act............................................. 16

        F.   The *Younger* Abstention Doctrine .................................. 17

   II.   The Cross Appeal................................................................ 18

STANDARD OF REVIEW ....................................................................... 19

LAW AND ARGUMENT.......................................................................... 20

   I.   The district court correctly held that the Plaintiffs' declaratory judgment claim did not create jurisdiction under 28 U.S.C. § 1343(a)(3)....................................... 20

   II.   The district court correctly held that 42 U.S.C. § 1983 did not create  federal jurisdiction over the Plaintiffs' declaratory judgment claim............................................. 21

   III.   The district court correctly held that 28 U.S.C. § 1331 did not create jurisdiction over a declaratory judgment claim concerning a federal defense to state-law claims.................. 24

   IV.   The district court had discretion to dismiss the Plaintiffs' claim........................................................................ 27

        A.   District courts have discretion in deciding whether to hear declaratory judgment claims, even if they otherwise have subject-matter jurisdiction.................... 27

        B.   The request for injunctive relief did not negate the district court's discretion to dismiss the declaratory judgment claim................................................ 28

-iii-

# TABLE OF CONTENTS

**Page**

     C.   The district did not abuse its discretion in dismissing the declaratory judgment claim........................................ 29

  V.  The Anti-Injunction Act warranted dismissal of this lawsuit, to the extent the Plaintiffs are attempting to prevent Cleveland's pursuit of state litigation....................... 32

  VI.  The *Younger* abstention doctrine may empower the Court to affirm dismissal of the lawsuit, to the extent it seeks to enjoin Cleveland's prosecution of its state-law litigation..... 34

VII.  The district court erred in holding that it had jurisdiction over the Plaintiffs' claim for injunctive relief........................ 37

CONCLUSION ...................................................................... 41

CERTIFICATE OF COMPLIANCE ....................................... 42

CERTIFICATE OF SERVICE ................................................ 43

DESIGNATION OF RECORD ............................................... 44

ADDENDA............................................................................ 45

    STATE COMPLAINT............................................... A-1

    UNREPORTED CASES........................................... A-36

# TABLE OF CASES

**Page**

*Adrian Energy Assoc. v. Michigan Pub. Serv. Comm'n*,
481 F.3d 414 (6th Cir. 2007)................................................. 28

*Amalgamated Clothing Workers v. Richman Bros. Co.*,
348 U.S. 511 (1955)............................................................. 32

*Ammex, Inc. v. Cox*,
351 F.3d 697 (6th Cir. 2003)................................................. 38

*AmSouth Bank v. Dale*,
386 F.3d 763 (6th Cir. 2004)........................................ 25,26,27,30,31

*Arden House, Inc. v. Heintz*,
612 F. Supp. 81 (D. Conn. 1985)......................................... 21

*Association of Banks in Ins. v. Duryee*,
270 F.3d 397 (6th Cir. 2001)................................................. 23

*Atlantic Coast Line Rwy. v. Brotherhood of Locomotive Eng'rs*,
398 U.S. 281 (1970)............................................................. 32,33

*Banas v. Dempsey*,
742 F.2d 277 (6th Cir. 1984), *aff'd*, 474 U.S. 64 (1985)...................... 20

*Bellotti v. Baird*,
428 U.S. 132 (1976)............................................................. 35

*Capital One Bank (USA) v. McGraw*,
563 F. Supp. 2d 613 (S.D.W.Va. 2008)................................. 23

*Carroll v. City of Mount Clemens*,
139 F.3d 1072 (6th Cir. 1998)............................................. 35

*Chapman v. Houston Welfare Rights Org.*,
441 U.S. 600 (1979)............................................................. 21

*City of Cleveland v. Ameriquest Mtg. Sec.*,
615 F.3d 496 (6th Cir. 2010)................................................. 9

*Coles v. Granville*,
448 F.3d 853 (6th Cir. 2006)................................................. 34

# TABLE OF CASES

**Page**

*Collins v. Blue Cross Blue Shield*,
103 F.3d 35 (6th Cir. 1996)...................................................... 25

*Colony Ins. Co. v. Holly*,
No. Civ. A 02-56, 2002 WL 31683675 (E.D.La. Nov. 27, 2002)...... 31

*Eastman v. Marine Mech. Corp.*,
438 F.3d 544 (6th Cir.), *cert. denied*, 549 U.S. 815 (2006).................... 24

*Eidson v. State of Tenn. Dept' of Children's Serv.*,
510 F.3d 631 (6th Cir. 2007).................................................. 34

*First Nat. Bank v. Marquette Nat. Bank*,
636 F.2d 195 (8th Cir. 1980), *cert. denied*, 450 U.S. 1042 (1981)........ 23

*Franchise Tax Bd. v. Construction Laborers Vacation Trust*,
463 U.S. 1 (1983)..................................................................... 25,27

*Golden State Transit Corp. v. City of Los Angeles*,
493 U.S. 103 (1989)................................................................. 20,23

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)................................................................. 22

*GTE Mobilenet v. Johnson*,
111 F.3d 469 (6th Cir. 1997).................................................... 36

*Gustafson v. City of Lake Angelus*,
76 F.3d 778 (6th Cir.), *cert. denied*, 519 U.S. 823 (1996).................... 22

*Heydon v. MediaOne*,
327 F.3d 466 (6th Cir. 2003)................................................... 25,28

*Horne v. Fireman's Retirement Sys.*,
69 F.3d 233 (8th Cir. 1995).................................................... 28,29

*International Ass'n of Entrepreneurs v. Angoff*,
58 F.3d 1266, 170 (8th Cir. 1995), *cert. denied*, 516 U.S. 1072 (1996)    39

*Johnson v. City of Detroit*,
446 F.3d 614 (6th Cir. 2006).................................................... 22

# TABLE OF CASES

Page

*Johnson-Kurek v. Abu-Absi*,
423 F.3d 590 (6th Cir. 2005), *cert. denied*, 546 U.S. 1175 (2006).........    21

*Lexington Ins. Co v. Rolison*,
434 F. Supp. 2d 1228 (S.D. Ala. 2006)................................    28

*Ley v. Visteon Corp.*,
543 F.3d 801 (6th Cir. 2008)................................................     9

*Louisville Country Club v. Watts*,
178 F.3d 1295 [unpublished], Nos. 97-5758, 97-5829
(6th Cir. Apr. 16, 1999), *cert. denied*, 528 U.S. 1061 (1999)...............    35

*Marel v. LKS Acquisitions, Inc.*,
585 F.3d 279 (6th Cir. 2009)................................................    24

*Martingale LLC v. City of Louisville*,
361 F.2d 297 (6th Cir.), *cert. denied*, 543 U.S. 955 (2004)..................    33

*Memphis Biofuels, LLC v. Chickasaw Nation Indus.*,
585 F.3d 917 (6th Cir. 2009)................................................    19

*Michigan S&L League v. Francis*,
683 F.2d 957 (6th Cir. 1982)................................................    26

*Michigan S. R.R. Co. v. Branch & St. Joseph Ctys. Rail Users Ass'n*,
287 F.3d 568 (6th Cir. 2002)................................................  24-25

*Mikulski v. Centerior Energy Corp.*,
501 F.3d 555 (6th Cir. 2007), *cert. denied*, 553 U.S. 1031 (2008)..... 25,37,39

*Moldowan v. City of Warren*,
578 F.3d 351 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 3504 (2010)........    22

*O'Neill v. Coughlan*,
511 F.3d 638 (6th Cir.), *cert. denied*, 129 S.Ct. 570 (2008)................. 35,36-37

*Phillip Morris, Inc. v. Blumenthal*,
123 F.3d 103 (2nd Cir. 1997), *cert. Denied*, 524 U.S. 937 (1998).........    36

*Public Serv. Comm'n v. Wycoff Co.*,
344 U.S. 237 (1952).............................................................    25

## TABLE OF CASES

**Page**

*Roth v. Bank of the Commonwealth,*
583 F.2d 527 (6th Cir. 1978)...............................................................  32,33,34

*Scottsdale Ins. Co. v. Roumph,*
211 F.3d 964 (6th Cir. 2000)................................................................  19

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943)................................................................................  31

*Shaw v. Delta Air Lines,*
463 U.S. 85 (1983)................................................................................  38,39

*Skelly Oil Co. v. Phillips Petroleum Co.,*
339 U.S. 667 (1950)..............................................................................  25

*State Auto Ins. Cos. v. Summy,*
234 F.3d 131 (3rd Cir. 2000)................................................................  31

*Strong v. Telectronics Pacing Sys.,*
78 F.3d 256 (6th Cir. 1996)..................................................................  39

*Sun Refining & Mktg. Co. v. Brennan,*
921 F.2d 635 (6th Cir. 1990)................................................................  36

*Tropf v. Fidelity Nat. Title Ins. Co.,*
289 F.3d 929 (6th Cir. 2002), *cert. denied*, 537 U.S. 1118 (2003).......  33

*Vaden v. Discover Bank,*
129 S.Ct. 1262 (2009)..........................................................................  25,37

*Vendo Co. v. Lektro-Vend Corp.,*
433 U.S. 623 (1977)..............................................................................  32

*Wachovia Bank v. Burke,*
414 F.3d 305 (2nd Cir. 2005), *cert. denied*, 550 U.S. 913 (2007)..........  23

*Wachovia Bank v. Watters,*
334 F. Supp. 2d 957 (W.D. Mich. 2004),
 *aff'd*, 431 F.3d 556 (6th Cir. 2005), *aff'd*, 550 U.S. 1 (2007)...............  23

*White Mountain Apache Tribe v. Williams,*
810 F.2d 844 (9th Cir. 1985), *cert. denied*, 479 U.S. 1060 (1987)........  20

## TABLE OF CASES

Page

*Willett v. Commissioner of Internal Rev.,*
277 F.2d 586 (6th Cir.), *cert. denied*, 364 U.S. 914 (1960).....................    31

*Wilton v. Seven Falls Co.,*
515 U.S. 277 (1995).............................................................................  27,31

*Wysocki v. IBM,*
607 F.3d 1102 (6th Cir. 2010).............................................................    19

*Younger v. Harris,*
401 U.S. 37 (1971)........................................................................... *passim*

## TABLE OF OTHER AUTHORITIES

Page

Ohio Rev. Code § 715.261 ...................................................     9

28 U.S.C. § 1331 ........................................................... *passim*

28 U.S.C. § 1343 ................................................... 3,5,12,15,20,21

28 U.S.C. § 2201 ...............................................................    27

28 U.S.C. § 2283........................................................  5,17,32,39

42 U.S.C. § 1983 .......................................................... *passim*

U.S. CONST., ART. VI............................................................    20

## DESIGNATION OF PARTIES

This Brief refers to Defendant-Appellee and Cross Appellant City of Cleveland as either "Cleveland" or "the City." It refers to Plaintiff-Appellants and Cross Appellees Chase Bank U.S.A., N.A., JP Morgan Bank, N.A., JP Morgan Mortgage Acquisition Corp., and JP Morgan Securities, Inc. as the "Plaintiffs" or (collectively) as "JP Morgan."

## STATEMENT REGARDING ORAL ARGUMENT

Cleveland respectfully asks the Court to conduct oral argument in this matter. Doing so will assist in elucidating the complex issues presented for review.

## JURISDICTIONAL STATEMENT

I.    **District Court Jurisdiction**

The Plaintiffs filed this action in the United States District Court for the Northern District of Ohio, raising a single claim for declaratory judgment based upon a supposed conflict between federal law and state-law claims asserted by the City in separate litigation.  According to the Plaintiffs, their claim raised a federal question that bestowed subject-matter jurisdiction on the court pursuant to 28 U.S.C. § 1331.  The Plaintiffs also invoked 28 U.S.C. § 1343(a)(3) as grounds for jurisdiction, given the supposed infringement upon their constitutional rights under the Supremacy Clause that Cleveland was purportedly inflicting through prosecution of its other lawsuit.

II.    **Appellate Jurisdiction**

JP Morgan has appealed the district court's decision to dismiss this lawsuit, while Cleveland's is cross appealing the district court's rejection of one of the principal arguments that it offered in support of its Motion to Dismiss.  This Court has jurisdiction to hear these matters pursuant to 28 U.S.C. § 1291.

III.    **Filing Dates and Timeliness of Appeal and Cross Appeal**

The district court dismissed the Plaintiffs' lawsuit in a judgment

entry dated August 5, 2010 [RE #39].  The Plaintiffs filed their Notice of

Appeal on September 3, 2010 [RE #40], and Cleveland filed its Notice of

Cross Appeal four dates later [RE #41].  These facts confirm the timeliness

of the appeal and cross appeal.

IV.    **Final Appealable Order**

The appeal and cross appeal address a final appealable order

entered by the district court that disposed of all outstanding claims.

## ISSUES PRESENTED FOR REVIEW

I.     **The Appeal**

1.     Did 28 U.S.C. § 1343(a)(3) give the district court jurisdiction over claims based upon alleged violations of the Plaintiffs' rights under the Supremacy Clause of the United States Constitution?

2.     Did 42 U.S.C. § 1983 create a basis for jurisdiction over the Plaintiffs' attempt to enforce the National Bank Act under the Supremacy Clause of the United States Constitution?

3.     Do declaratory judgment claims raise a federal question for jurisdictional purposes under 28 U.S.C. § 1331 when they address the viability of a federal defense to pending state-law claims?

4.     Do district courts have discretion to dismiss claims for declaratory and injunctive relief that require them to determine the validity of defenses to state claims pending in separate litigation?

5.     Did the Anti-Injunction Act, 28 U.S.C. § 2283, require the district court to dismiss the Plaintiffs' claim, to the extent that it sought to enjoin prosecution of pending state-court litigation?

6.     Under the authority of *Younger v. Harris*, 401 U.S. 37 (1971), must federal courts abstain from adjudicating claims that seeks to enforce a federal preemption defense to pending state litigation?

II.    **The Cross Appeal**

7.    Does a request for injunctive relief present a federal question

for jurisdictional purposes, when the underlying claim essentially raises

a federal defense to state-law claims?

## STATEMENT OF THE CASE

Cleveland adopts the Statement of the Case included in the Brief filed by the Plaintiffs.

## STATEMENT OF FACTS

### I.     **The Plaintiffs**

Plaintiffs Chase Bank U.S.A,, N.A. and JPMorgan Chase Bank, N.A. are national banks [RE #29,¶24-¶25].  Plaintiff JP Morgan Mortgage Acquisition Corp. is a subsidiary of JPMorgan Chase Bank [RE#29, ¶26]. Plaintiff J.P. Morgan Securities, Inc. is a subsidiary of JP Morgan Chase Holding, Inc., which also owns the two national banks [RE#29, ¶27, ¶1].

### II.     **The Public Nuisance Lawsuit**

On January 10, 2008, Cleveland filed a public nuisance action against JPMorgan Chase Holding and various other financial institutions in Ohio state court [RE #29, ¶1].  The lawsuit charged the defendants of creating a foreclosure crisis in the City by financing subprime loans through the process of securitization [RE#29, ¶1-¶2, ¶46].

The defendants removed Cleveland's public nuisance lawsuit to federal court [RE #29, ¶2].  The City thereafter tried to add JPMorgan Chase Bank as a defendant to the action – a move that the District Court rebuffed [RE#29, ¶3-¶4].

The District Court dismissed Cleveland's public nuisance action on May 15, 2009 [RE #29, ¶10].  Cleveland appealed the ruling to this Court,

which affirmed.  *See City of Cleveland v. Ameriquest Mtg. Sec.*, 615 F.3d 496 (6th Cir. 2010).

III.     **The State Lawsuit**

On August 22, 2008, Cleveland filed separate litigation in Ohio state court.  Its complaint included the public nuisance claim against JP Morgan Chase Bank that the City had unsuccessfully tried to introduce as part of its original lawsuit.  In addition, Cleveland alleged public nuisance claims against various other defendants [RE #29, ¶5].

The state lawsuit also included two statutory counts against JP Morgan Chase Bank and others [RE #29, ¶5].  Under one of the claims, Cleveland invoked Ohio Rev. Code § 715.261 to recover the "total costs" incurred in demolishing or maintaining properties that the defendants came to own through the foreclosure process. STATE COMPLAINT, ¶10.[1] With its other statutory claim, Cleveland sought to recover damages under the Ohio Corrupt Activities Act based upon the defendants' practice of filing foreclosure actions without valid title to the underlying promissory note or mortgage.  *Id.*, ¶92.

---

[1]     In reviewing dismissal of a lawsuit, the Court may take into account both "public records" and "materials that are integral to the complaint."  *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008).  The state complaint falls within both of these categories.  A copy of the pleading appears as an Addendum to this Brief.

IV.     **The Amended Complaint**

A.     **Claim for Declaratory Relief**

The Plaintiffs' Amended Complaint contains a single count for relief under the Declaratory Judgment Act.  The claim rests on the premise that Cleveland's state and federal lawsuits

> threaten to impose liability upon – and improperly create state tort standards with respect to – ... [their] banking activities.  The lawsuits threaten to have a direct and not incidental effect on such banking activities.

[RE #29, ¶29].

The Plaintiffs referred in particular to their authority to engage in real estate mortgage lending and related businesses under the National Bank Act and regulations adopted by the Office of the Comptroller of the Currency. [RE#29, ¶34-¶38].  According to the Plaintiffs, federal law "expressly prohibit[s]" the type of "direct state interference with national banks" that Cleveland has supposedly created by prosecuting its cases [RE #29, ¶29].

More directly, the Plaintiffs alleged that federal law preempts "Cleveland's assertions" that their "activities ... are unlawful under state nuisance law or other state common-law or statutory doctrines" [RE #29, ¶46].  They also specifically allege that the National Bank Act and OCC

-10-

regulations preempt the two Ohio statutory claims included in Cleveland's state lawsuit [RE #29, ¶47-¶48].

B.   **Request for Relief**

Based on these allegations, the Plaintiffs sought a declaratory judgment that federal law preempts

> A)  Ohio law as it relates to the Plaintiffs' financing of subprime mortgages;
>
> B)  claims against national banks and their subsidiaries to recoup the cost of "monitoring, maintaining, and demolishing foreclosed properties"; and
>
> C)  application of the Ohio Corrupt Activities Act against national banks or their subsidiaries to the "inaccurate[ ]' identification of the "actual property owner in a foreclosure action"

[RE #29, Prayer for Relief].  The Plaintiffs also requested an injunction under their claim for declaratory relief, which would bar Cleveland from "pursuing and maintaining" its two lawsuits or taking other action that interfered with the Plaintiffs' real estate mortgage lending business [RE #29, Prayer for Relief].

C.   **Jurisdiction**

In the Amended Complaint, the Plaintiffs claimed subject-matter jurisdiction under 28 U.S.C. § 1331, based upon the federal question

-11-

purportedly raised by their declaratory judgment claim, and under 28 U.S.C. § 1343(a)(3), given the deprivation of their "federal constitutional rights" that supposedly took place as Cleveland pursued state-law claims in the face of federal law they characterized as preemptive [RE #29, ¶10]. The Plaintiffs also alleged that the Amended Complaint stated a civil rights claims under 42 U.S.C. § 1983, which they presented as an independent basis for jurisdiction [RE #29, §10].

V.    **Dismissal of Lawsuit**

A.    **Partial Granting of Motion to Dismiss**

Cleveland moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction [RE #31]. The district court granted the motion in part, holding that neither 28 U.S.C. § 1343(a)(3) nor 42 U.S.C. § 1983 created grounds for jurisdiction [RE #38, pp. 7-11].

The district court further determined that it lacked jurisdiction under 28 U.S.C. § 1331 over the Plaintiffs' claim for declaratory relief, which sought to validate their preemption defense to the claims Cleveland was pursuing in separate lawsuits. The district court based this ruling on the prohibition against predicating jurisdiction a "defense that raises a federal question," rather than an affirmative claim" [RE #38, p. 6].

### B.     Jurisdiction to Consider Request for Injunction

This deficiency notwithstanding, the district court found that the Plaintiffs had properly invoked federal jurisdiction by seeking injunctive relief as an adjunct to their claim for declaratory judgment.  The district court held that a federal question arises for purposes of § 1331 when a litigant sues to enjoin "state regulation, on the ground that ... [it] is pre-empted by federal statute" [RE #38, pp. 11-12].

The Plaintiffs requested an injunction that would prohibit Cleveland from proceeding with its state and federal litigation.  The district court concluded that it had jurisdiction under § 1331 to enjoin the lawsuits – which it regarded as "regulation," even though the City was suing exclusively for damages, and not as part of some conventional enforcement action [RE #38, pp. 11-14].

### C.     Dismissal without Prejudice

Jurisdiction or no jurisdiction, the district court chose to dismiss the Plaintiffs' request for injunctive relief without prejudice.  It did so principally because the Plaintiffs could not establish the "irreparable harm" necessary to justify entry of an injunction [RE #38, pp. 15-17].  The district court reasoned that the Plaintiffs would "have an opportunity to

... raise the issue of federal preemption" in the two lawsuits that Cleveland is currently prosecuting [RE #38, p. 17].

Given this circumstance, the district court decided that the Plaintiffs' "desire to have the issue resolved in this forum" did not encompass the sort of injury that warranted the "extraordinary remedy of injunction" [RE #38, p. 17]. The district court further held that the Plaintiffs' request to enjoin Cleveland's lawsuits "is not yet ripe," apparently because the question of preemption had not yet gone to judgment in those cases [RE #38, p. 18].

## SUMMARY OF ARGUMENT

I.    **The Appeal**

    A.    **28 U.S.C. § 1343(a)(3)**

The district court correctly held that 28 U.S.C. § 1343(a)(3) did not create subject-matter jurisdiction over this dispute.  Section 1343(a)(3) generally permits federal courts to hear cases arising from the "deprivation" of constitutional rights.  The Supremacy Clause, however, does not create rights enforceable under the statute.  This principle precludes the Plaintiffs from invoking § 1343(a)(3).

    B.    **42 U.S.C. § 1983**

The Plaintiffs also failed to establish jurisdiction under 42 U.S.C. § 1983, as the district court properly concluded.  Section 1983 creates a right of action based upon the violation of federal or constitutional rights under "color of law."  Since neither the Supremacy Clause nor the National Bank Act support claims under the statute, the Plaintiffs cannot establish subject-matter jurisdiction by this means.

    C.    **28 U.S.C. § 1331**

The district court correctly held that the Plaintiffs' claim for declaratory relief did not fall within the purview of 28 U.S.C. § 1331, which generally establishes jurisdiction over lawsuits that raise a federal

question.  Section 1331, however, does not apply to federal questions that arise in the form of defenses.  The Plaintiffs' declaratory judgment claim presents the case in this posture, since it asked the district court to pass upon their preemption defense to state-law claims that Cleveland is pursuing in separate litigation.

D.    **Discretion to Abstain from Hearing Declaratory Judgment Claims**

Jurisdictional considerations aside, the district court did not err in dismissing this lawsuit without prejudice, even though it evaluated the issue under inapplicable standards.  A district court has broad discretion to abstain from hearing a claim for declaratory judgment – the only cause of action the Plaintiffs included in their Amended Complaint.  That discretion remains intact despite the plaintiff's inclusion of a perfunctory request for injunctive relief.  While the district court putatively focused upon "irreparable harm" and "ripe[ness]" in deciding to dismiss, its analysis spoke to many of the same factors that courts consider in deciding whether to retain declaratory judgment claims.

E.    **The Anti-Injunction Act**

The Anti-Injunction Act required dismissal of this case, to the extent the Plaintiffs are seeking to prevent Cleveland from pursuing its lawsuit in Ohio state court.  The Act explicitly bars federal courts from

-16-

"grant[ing] an injunction to stay proceedings in a State court."  28 U.S.C. § 2283.  Courts broadly enforce this prohibition, which applies to actions seeking declaratory judgments as well as injunctions, if they would have the same practical effect in impeding state litigation.  The Anti-Injunction Act protects state-court actions even if they begin when the federal action is already pending.  The Court may affirm dismissal on the basis of the Anti-Injunction Act,  even though the parties did not raise it in the district court and the district court did not consider it in rendering its decision.

F.    **The *Younger* Abstention Doctrine**

Cleveland disagrees with the district court's characterization of its litigation against JP Morgan as an exercise in state "regulation." Nevertheless, if the Court endorses this finding of the district court, it can affirm dismissal of the lawsuit under the authority of *Younger v. Harris*, 401 U.S. 37 (1971), to the extent the Plaintiffs are seeking to impede Cleveland from prosecuting its lawsuit against them in Ohio state court. *Younger* generally directs federal courts to abstain from interfering with state-court litigation that implicates important state interests.    If Cleveland's state case qualifies as "regulation," it would necessarily satisfy

-17-

all of the requirements for application of *Younger*, which the Court may consider for the first time on appeal.

II.    **The Cross Appeal**

While the district court correctly dismissed the Plaintiffs' request for injunctive relief, it erred in holding that it had jurisdiction to consider the matter. Federal courts have jurisdiction to enjoin state officials from enforcing federally-preempted regulations. The Plaintiffs, however, have sued to enjoin litigation, not regulation – their case exclusively seeks to validate  preemption as a defense to Cleveland's state-law claims. This holds true equally with respect to the Plaintiffs' request for an injunction and their request for declaratory judgment. Since a defense cannot establish federal jurisdiction, the district court should have dismissed the entire case on this basis.

## STANDARD OF REVIEW

When a defendant moves for dismissal for lack of subject-matter

jurisdiction based strictly on the pleadings, this Court conducts a *de novo*

review of the district court's decision. *Memphis Biofuels, LLC v. Chickasaw*

*Nation Indus.*, 585 F.3d 917, 919 (6th Cir. 2009). It reviews a district court's

decision whether to hear claims alleged "under the Declaratory Judgment

Act ... for abuse of discretion." *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964,

967 (6th Cir. 2000). Reversal for abuse of discretion reflects a "definite and

firm conviction that the trial court committed a clear error of judgment."

*Wysocki v. IBM*, 607 F.3d 1102, 1104 (6th Cir. 2010).

## LAW AND ARGUMENT

I.     **The district court correctly held that the Plaintiffs' declaratory judgment claim did not create jurisdiction under 28 U.S.C. § 1343(a)(3).**

The district court correctly held that the Plaintiffs' declaratory judgment claim did not create jurisdiction under 28 U.S.C. § 1343(a)(3). The statute establishes federal jurisdiction over civil actions that

> redress the deprivation, under color of any State law ... of any right, privilege or immunity secured by the Constitution of the United States ....

According to the Plaintiffs, the district court had jurisdiction over this case pursuant to § 1343(a)(3), since they were suing to secure preemption of Cleveland's state-law claims under the Supremacy Clause.  U.S. CONST., ART. VI.

The Supremacy Clause, however, "is not a substantive constitutional provision that creates rights" for purposes of § 1343(a)(3).  *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 848 (9th Cir. 1985), *cert. denied*, 479 U.S. 1060 (1987); *see also Banas v. Dempsey*, 742 F.2d 277, 278, fn. 1 (6th Cir. 1984), *aff'd*, 474 U.S. 64 (1985).  "[C]onstitutional claims" based exclusively upon the Supremacy Clause do not fall within the ambit of the statute.  *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, fn. 4 (1989). In light of this fact, an "allegation of conflict between federal

-20-

and state law does not in itself give rise to a claim securing jurisdiction under" § 1343(a)(3). *Arden House, Inc. v. Heintz*, 612 F. Supp. 81, 84 (D. Conn. 1985); *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 615 (1979).

The Plaintiffs cannot use the Supremacy Clause to bring this lawsuit under § 1343(a)(3). Regardless of whether Cleveland's claims conflict with federal law, this circumstance did not implicate the sort of constitutional violation that qualifies as grounds for a federal lawsuit. The district court correctly found that § 1343(a)(3) did not authorize the Plaintiffs to prosecute their declaratory judgment claim in federal court.

II. **The district court correctly held that 42 U.S.C. § 1983 did not create federal jurisdiction over the Plaintiffs' declaratory judgment claim.**

The district court also correctly held that 42 U.S.C. § 1983 did not create federal jurisdiction over the Plaintiffs' lawsuit. Section 1983 imposes liability upon defendants who deprive others of federal rights while acting under the "color of law." *See generally Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005), *cert. denied*, 546 U.S. 1175 (2006).

Section 1983 does not itself create "substantive rights" but instead provides a " method for vindicating federal rights elsewhere conferred."

*Moldowan v. City of Warren*, 578 F.3d 351, 376 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 3504 (2010) (internal quotation marks omitted).  Moreover, "it is only violations of ***rights***, not ***laws***, which give rise to § 1983 actions." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original).  The plaintiff can prevail only by proving the deprivation of an "unambiguously conferred right" under federal law.  *Id.*  Where "the text and structure of a statute provide no indication that Congress intend[ed] to create individual rights, there is no basis for a private suit" under § 1983.  *Id.* at 286; *see also Johnson v. City of Detroit*, 446 F.3d 614, 620 (6th Cir. 2006).

A "claim premised on a violation of the Supremacy Clause through preemption is not cognizable under" § 1983.  *Gustafson v. City of Lake Angelus*, 76 F.3d 778, 792 (6th Cir.), *cert. denied*, 519 U.S. 823 (1996).  To proceed under § 1983, the Plaintiffs would have to premise their claim directly upon the National Bank Act, based upon their supposed right under the statute to "exercise enumerated banking powers free of state interference."  Brief of Appellants, p. 21.

Congress, however, promulgated the National Bank Act in order to establish a "national banking system" for the benefit of the public, rather than bestowing particular rights and privileges upon national

banks.     *Wachovia Bank v. Burke*, 414 F.3d 305, 323 (2nd Cir. 2005), *cert.*

*denied*, 550 U.S. 913 (2007); *see also Wachovia Bank v. Watters*, 334 F. Supp.

2d 957, 966 (W.D. Mich. 2004), *aff'd*, 431 F.3d 556 (6th Cir. 2005), *aff'd*, 550

U.S. 1 (2007).  The statute preempts state law merely "as an incident of the

federal scheme of regulation" in order to maintain "uniformity in the

administration of federal regulatory jurisdiction, as opposed to creat[ing]

federal rights."  *See Burke*, 414 F.3d at 323-24, *quoting Golden State Transit*,

493 U.S. at 109-10.  In light of these considerations, federal courts have

uniformly held that the National Bank Act does not comprise rights

enforceable under § 1983.  *See Burke*, 414 F.3d at 321-24; *First Nat. Bank v.*

*Marquette Nat. Bank*, 636 F.2d 195, 198 (8th Cir. 1980), *cert. denied*, 450 U.S.

1042 (1981); *Capital One Bank (USA) v. McGraw*, 563 F. Supp. 2d 613, 628-30

(S.D.W.Va. 2008); *Watters*, 334 F. Supp. 2d at 966.[2]

---

[2]     *Association of Banks in Ins. v. Duryee*, 270 F.3d 397 (6th Cir. 2001), does
not hold to the contrary.  As the Plaintiffs concede, the Court decided
*Duryee* under the Federal Reserve Act, not the National Bank Act.
BRIEF OF APPELLANTS, p. 23, fn. 15.  The Court also did not expressly
consider whether this (or any other) statute gave the plaintiff
enforceable rights under § 1983, the applicability of which it simply
assumed.  The Court need not extrapolate from *Duryee* when ample
case law speaks directly and conclusively to the unavailability of
§ 1983 to assert claims based on the National Bank Act.

This precedent dooms the Plaintiffs' attempt to invoke § 1983. Since the statute does not authorize claims based upon either the Supremacy Clause or the National Bank Act, it provides no grounds for subject-matter jurisdiction in this case.

III.    **The district court correctly held that 28 U.S.C. § 1331 did not create jurisdiction over a declaratory judgment claim concerning a federal defense to state-law claims.**

The district court correctly determined that 28 U.S.C. § 1331 did not support subject-matter jurisdiction over the Plaintiffs' claim for declaratory relief.  Section 1331 creates original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  A claim falls within the purview of the statute only where a "well-pleaded complaint" establishes

> either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.

*Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 550 (6th Cir.), *cert. denied*, 549 U.S. 815 (2006).

"The federal Declaratory Judgment Act [does] not expand the scope of federal subject matter jurisdiction" under § 1331.  *Marel v. LKS Acquisitions, Inc.*, 585 F.3d 279, 280 (6th Cir. 2009).  The Act "cannot serve as an independent basis" for invoking the statute.  *Michigan S. R.R. Co. v.*

*Branch & St. Joseph Ctys. Rail Users Ass'n*, 287 F.3d 568, 575 (6th Cir. 2002).

A declaratory judgment claim must "otherwise state a federal question"

in order to create grounds for jurisdiction. *Heydon v. MediaOne*, 327 F.3d

466, 470 (6th Cir. 2003).

Moreover, the "declaratory judgment procedure" does not

transform a federal defense to state claims into a federal question for

jurisdictional purposes. *Franchise Tax Bd. v. Construction Laborers Vacation

Trust*, 463 U.S. 1, 16 (1983) (internal quotation marks omitted), *citing Skelly

Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672 (1950).  "Federal

jurisdiction cannot be predicated on an actual or anticipated defense."

*Vaden v. Discover Bank*, 129 S.Ct. 1262, 1272 (2009); *accord, Collins v. Blue

Cross Blue Shield*, 103 F.3d 35, 36 (6th Cir.  1996).  "[I]t is the character of"

the underlying claim, "and not of the defense, which will determine

whether there is federal question jurisdiction." *AmSouth Bank v. Dale*, 386

F.3d 763, 775 (6th Cir. 2004), *quoting Public Serv. Comm'n v. Wycoff Co.*, 344

U.S. 237, 248 (1952).  "Even a defense that relies on the ... pre-emptive

effect of a federal statute will not provide a basis" for federal jurisdiction.

*See Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 560 (6th Cir. 2007), *cert.

denied*, 553 U.S. 1031 (2008) (internal quotation marks omitted) (discussing

removal jurisdiction).

In *Michigan S&L League v. Francis*, 683 F.2d 957 (6th Cir. 1982), a consortium of federal savings-and-loan banks sued for declaratory judgment that federal law preempted a state statute prohibiting discrimination in lending. This Court recognized that the banks were trying to "ward off" possible state regulatory action "by seeking a declaratory judgment to the effect that (they) [would] have a good defense to the anticipated suit." *Id.* at 961 (internal quotation marks omitted). In affirming dismissal of the lawsuit, the Court held that federal jurisdiction does not exist where "federal preemption is raised as a defense to threatened state action" by means of a declaratory judgment action. *Id.* at 962.

The district court lacked jurisdiction in this case for the very same reason. The Plaintiffs sought a declaration that federal law pre-empts the claims that Cleveland is independently pursuing in separate litigation.

The "character" of these state-law causes of action determines whether the Plaintiffs have raised a federal question, not the preemption defense they were asking the district court to endorse. *AmSouth*, 386 F.3d at 775. Since the City has alleged only "state created" claims, the dispute did not present a federal question for jurisdictional purposes, even if

-26-

federal law might ultimately shield the Plaintiffs from liability. *Franchise Tax Bd.*, 463 U.S. at 16. The district court properly determined that § 1331 did not confer subject-matter jurisdiction over the Plaintiffs' claim for declaratory relief.

## IV. The district court had discretion to dismiss the Plaintiffs' claim.

### A. District courts have discretion in deciding whether to hear declaratory judgment claims, even if they otherwise have subject-matter jurisdiction.

Irrespective of jurisdictional considerations, the district court did not err in dismissing the Plaintiffs' declaratory judgment claim. The Declaratory Judgment Act does not give litigants an "absolute right" to prosecute claims of this sort. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). Instead, the statute explicitly provides that district courts "*may*" grant declaratory relief upon the application of an interested party. 28 U.S.C. § 2201(a) (emphasis added).

This non-obligatory language confers discretion of "unique breadth" in deciding whether to hear claims for declaratory judgment. *Wilton*, 515 U.S. at 287. This discretion remains intact, "even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Id.* at 286; *see also AmSouth*, 386 F.3d at 784.

-27-

B.    **The request for injunctive relief did not negate the district court's discretion to dismiss the declaratory judgment claim.**

The Plaintiffs' request for an injunction did not negate the district court's discretion to dismiss the declaratory judgment claim. Federal court must exercise jurisdiction over claims for injunctive relief. *Adrian Energy Assoc. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 422 (6th Cir. 2007). If the plaintiff seeks this remedy along with their claim for declaratory judgment, the district court generally loses its discretion to pass upon the case. *Id.* at 422-23.

Simply requesting an injunction, however, will not automatically entitle plaintiffs to use declaratory judgment as a means of validating a federal defense. *See, e.g., Heydon*, 327 F.3d at 468-69. The court's discretion to dismiss such claims remains intact so long as the "essence" of the plaintiffs' "suit is one for declaratory judgment." *Horne v. Fireman's Retirement Sys.*, 69 F.3d 233, 236 (8th Cir. 1995). Accordingly, if the outcome of the declaratory judgment claim will necessarily determine the availability of injunctive relief, a district court may pass on the case. *See Lexington Ins. Co v. Rolison*, 434 F. Supp. 2d 1228, 1237 (S.D. Ala. 2006).

The Plaintiffs included only a single count in their Amended Complaint, which it entitled "Declaratory Relief." [RE #29, p. 10]. The claim seeks injunctive relief on any ancillary basis, solely as a means of enforcing the requested judgment that federal preemption defeats Cleveland's state law claims. Declaratory judgment, standing alone, would have this same effect.

These considerations confirm that the "essence" of the Plaintiffs' lawsuit remains their claim for declaratory relief. *Horne*, 69 F.3d at 236. The request for injunction derives inextricably from this principal aspect of the case. Under the circumstances, the district court retained discretion to dismiss the declaratory judgment claim, the proposed injunction notwithstanding.

C.    **The district did not abuse its discretion in dismissing the declaratory judgment claim.**

The district court did not abuse its discretion in dismissing the declaratory judgment claim. The district court made its decision based upon "irreparable harm" and "ripeness" concerns, while focusing upon the Plaintiffs' request for an injunction. [RE #38, pp. 17-18]. Its reasoning, however, touched upon various of the factors that inform the exercise of federal courts' discretion to dismiss claims for declaratory judgment:

-29-

1)  Would the judgment settle the controversy?

2)  Would the judgment serve a "useful pur-
    pose in clarifying the legal relations at
    issue?"

3)  Is the plaintiff using the declaratory
    remedy merely for the purpose of "proced-
    ural fencing" or in a "race" to judgment?

4)  Would hearing the case increase friction
    between state and federal courts and
    infringe upon state jurisdiction?

5)  Would an "alternative remedy" more effec-
    tively accomplish the desired result?

*AmSouth*, 386 F.3d at 785.

In dismissing the lawsuit, the district court noted that the Plaintiffs

would have the opportunity in both the federal and state litigation that

Cleveland is pursuing to press its arguments concerning preemption [RE

#38, p. 17].  The district court held that under the circumstances, the

Plaintiffs' "desire to have the issue resolved in this forum" did not justify

continuation of the case [RE #38, p. 17].  The district court also did not

regard the issue of preemption as "ripe" for its consideration, given the

absence of any ruling from the courts in Cleveland's two lawsuits [RE #38,

p, 18].

This analysis suggests that the district court was attempting to

avoid the "race" between the various lawsuits that would have ensued if

they simultaneously proceeded to address the issue of preemption. *AmSouth*, 386 F.3d at 785.  In doing so, it was acknowledging the other litigation as the preferred "alternative" for resolving this dispute.  *See id.* The district court defused potential conflict between state and federal courts by allowing Cleveland to proceed with its other cases.  *See id.*

The district court had discretion of "unique breadth" to take these considerations into account in deciding whether to proceed with the case.  *Wilton*, 515 U.S. at 287.  Each of them militated in favor of dismissal.

It makes no difference that the district court employed the wrong standards in determining whether to dismiss.  This Court may affirm a decision that reaches an appropriate result, even if it rejects the reasoning used by the trial court in making its ruling.  *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *see also Willett v. Commissioner of Internal Rev.*, 277 F.2d 586, 589 (6th Cir.), *cert. denied*, 364 U.S. 914 (1960).[3]

---

[3]    It also does not matter that the Plaintiffs had no opportunity to brief the pertinent issues before the district court dismissed the declaratory judgment claim.  Court's may act *sua sponte* in exercising their discretion in this fashion.  *See State Auto Ins. Cos. v. Summy*, 234 F.3d 131, 136 (3rd Cir. 2000); *Colony Ins. Co. v. Holly*, No. Civ. A 02-56, 2002 WL 31683675 at *1 (E.D.La. Nov. 27, 2002).

The district court did not abuse its discretion in dismissing the declaratory judgment claim without prejudice. The Plaintiffs' appeal of this ruling must fail.

V.    **The Anti-Injunction Act warranted dismissal of this lawsuit, to the extent the Plaintiffs are attempting  to prevent Cleveland's pursuit of state litigation.**

The Anti-Injunction Act warranted dismissal of this lawsuit, to the extent the Plaintiffs are attempting to prevent Cleveland from pursuing its litigation in Ohio state court. As noted above, the Act prohibits federal courts from "grant[ing] an injunction to stay proceedings in a State court." 28 U.S.C. § 2283. In doing so, it serves to "forestall the inevitable friction between the state and federal courts that ensues" when a federal court enjoining state judicial proceedings. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977).

The Anti-Injunction Act imposes an "absolute prohibition" against such injunctions, except under specified exceptions, none of which apply in this case. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 533 (6th Cir. 1978), *quoting Atlantic Coast Line Rwy. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). The "prohibition is not be whittled away by judicial improvisation." *Vendo Co.*, 433 U.S. at 631, *quoting Amalgamated Clothing Workers v. Richman Bros. Co.*, 348 U.S. 511, 514 (1955). "Any

doubts" concerning the "propriety" of a federal injunction against state-court litigation

> should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy.

*Atlantic Coast Line Rwy.*, 398 U.S. at 297.

The Anti-Injunction Act forecloses both injunctions that block state-court actions and claims for declaratory relief that "would have the same practical effect." *Martingale LLC v. City of Louisville*, 361 F.2d 297, 303 (6th Cir.), *cert. denied*, 543 U.S. 955 (2004). The statute protects state court lawsuits like Cleveland's, "commenced after the institution of the federal suit but before the ... injunction was issued." *Roth*, 583 F.2d at 528; *see also Tropf v. Fidelity Nat. Title Ins. Co.*, 289 F.3d 929, 941 (6th Cir. 2002), *cert. denied*, 537 U.S. 1118 (2003). The Court may consider whether the Anti-Injunction justified dismissal of the lawsuit, even if the "district court did not address" the statute and the "parties did not raise" it. *Martingale*, 361 F.2d at 302.

The Plaintiffs have sued to block Cleveland from going forward with its action in Ohio state court. Their requests for both declaratory judgment and injunctive relief seek to preclude further proceedings in the state litigation on the basis of the federal preemption defense. This aspect

of the lawsuit falls squarely within the "absolute prohibition" of the Anti-Injunction Act. *Roth*, 583 F.2d at 533.

The Act applies, even though Cleveland filed its state case after commencement of this action. The Court may affirm dismissal on this basis, even though the district court did not consider it in rendering judgment. The Plaintiffs cannot escape the bar imposed by the Anti-Injunction Act.

## VI.   The *Younger* abstention doctrine may empower the Court to affirm dismissal of the lawsuit, to the extent it seeks to impede Cleveland's prosecution of its state-law litigation.

The Court may have grounds to affirm dismissal of this litigation under the authority of *Younger v. Harris*, 401 U.S. 37 (1971), to the extent these proceedings seek to impede Cleveland from prosecuting its lawsuit in Ohio state court against the Plaintiffs. *Younger* permits "state courts to try state cases free from interference by federal courts." *Eidson v. State of Tenn. Dept' of Children's Serv.*, 510 F.3d 631, 638 (6th Cir. 2007), *quoting Younger*, 401 U.S. at 43. The Supreme Court decision generally prevents litigants from interfering with

> an ongoing state action involving important state interests ... by maintaining a parallel federal action involving claims that could have been raised in the state case.

*Coles v. Granville*, 448 F.3d 853, 865 (6th Cir. 2006).

-34-

The Court may enforce *Younger* on appeal, even if the district court did not consider it. *Louisville Country Club v. Watts*, 178 F.3d 1295 [unpublished], Nos. 97-5758, 97-5829 at *2 (6th Cir. Apr. 16, 1999), *cert. denied*, 528 U.S. 1061 (1999), *cert. denied*, 528 U.S. 1061 (1999), *citing Bellotti v. Baird*, 428 U.S. 132, 143, fn. 10 (1976).  The doctrine requires abstention from claims for either injunctive or declaratory relief that impede ongoing state litigation. *Carroll v. City of Mount Clemens*, 139 F.3d 1072, 1074 (6th Cir. 1998).

Three factors determine whether *Younger* applies:

1) there must be ongoing state judicial proceedings;

2) those proceedings must implicate important state interests; and

3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges.

*O'Neill v. Coughlan*, 511 F.3d 638, 643 (6th Cir.), *cert. denied*, 129 S.Ct. 570 (2008).

In keeping with the requirements of *Younger*, Cleveland is prosecuting an "ongoing" lawsuit against JP Morgan in Ohio state court. *O'Neill*, 511 F.3d at 643.  The Plaintiffs will indisputably receive the

opportunity in that case to press their federal preemption defense, and any other "constitutional challenges" they perceive as necessary. *Id.*

Cleveland does not believe that a case necessarily touches upon "important state interests" if it seeks damages as its sole remedy. *O'Neill*, 511 F.3d at 643. The City's state lawsuit falls within this category. *See Phillip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 106-07 (2nd Cir. 1997), *cert. denied*, 524 U.S. 937 (1998) (state's claim to recoup amounts expended on tobacco-related illnesses did not involve "important state interests" under *Younger*).

The district court, however, classified Cleveland's lawsuit as an act of "regulation" [RE #38, pp. 13-14]. Under this premise, Cleveland would be exercising its sovereign police powers in pursuing litigation against the parties responsible for inflicting the subprime foreclosure crisis upon the City. Cleveland would have a "substantial, legitimate" interest in pursuing "generic proceedings of this kind." *See GTE Mobilenet v. Johnson*, 111 F.3d 469, 482 (6th Cir. 1997); *Sun Refining & Mktg. Co. v. Brennan*, 921 F.2d 635, 641 (6th Cir. 1990). The state litigation would therefore "implicate important state interests" for purposes of *Younger*. *O'Neill*, 511 F.3d at 643.

If Cleveland's state lawsuit qualifies as "regulation," then the Plaintiffs cannot use this litigation to block its prosecution. *Younger* abstention becomes necessary under these circumstances.

VII. **The district court erred in holding that it had jurisdiction over the Plaintiffs' claim for injunctive relief.**

While the district court correctly dismissed the Plaintiffs' request for injunctive relief, it erred in holding that it had jurisdiction to consider the matter. As discussed above, federal "jurisdiction cannot be predicated on an actual or anticipated defense." *Vaden*, 129 S.Ct. at 1272. "Even a defense that relies on the ... pre-emptive effect of a federal statute will not provide a basis" for federal jurisdiction. *See Mikulski*, 501 F.3d at 560 (discussing removal jurisdiction).

The federal question presented by the Plaintiffs' Amended Complaint exclusively addresses the validity of their preemption defense to Cleveland's state-law claims. This holds true equally with respect to their request for injunctive relief and their request for declaratory judgment. Both remedies seek to immunize the Plaintiffs from the "liability" that Cleveland's lawsuits "threaten to impose" and suppress the "state tort standards" that the cases may " improperly create" [RE #29, ¶29]. The district court could not properly entertain requests for either

form of relief, since the Plaintiffs based jurisdiction for each on a federal defense.

In rejecting this conclusion, the district court relied upon *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983). *Shaw* establishes federal jurisdiction over suits for "injunctive relief from state regulation, on the ground that such regulation is preempted" by federal law. 463 U.S. at 96, fn. 14. The district court held that Cleveland's prosecution of its two lawsuits constituted the sort of "regulation" that *Shaw* created jurisdiction to enjoin [RE #38, pp.11-14]. In doing so, it acknowledged that jurisdiction in injunction cases of this sort are

> often ... remarkably similar to an anticipation of a federal defense through a declaratory action, which generally does not create subject matter jurisdiction.

[RE #38, pp.11-12]. *See Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003).

The district court, however, did not recognize jurisdiction on grounds that were only "remarkably similar" to the assertion of a "federal defense." *Ammex*, 351 F.3d at 704. Its ruling instead exactly invokes this forbidden means of establishing jurisdiction. Under its formulation of the law, the mere filing of litigation by state officials becomes "regulation" that defendants can always sue to enjoin in federal court on the basis of

preemption. *See Shaw*, 463 U.S. at 96, fn. 14. No precedent exists for this approach, which "open[s] a new portal of entry to federal court for suits that are essentially defensive" in nature. *See International Ass'n of Entrepreneurs v. Angoff*, 58 F.3d 1266, 170 (8th Cir. 1995), *cert. denied*, 516 U.S. 1072 (1996) (discussing Declaratory Judgment Act).

The creation of this federal trump card promotes both piecemeal litigation and potential forum shopping. It distorts the ordinary division of authority between federal courts and state courts, which ordinarily adjudicate federal preemption issues for themselves. *Strong v. Telectronics Pacing Sys.*, 78 F.3d 256, 261 (6th Cir. 1996).

The district court's approach also collides with the Anti-Injunction Act's prohibition against injunctions that block ongoing state litigation. 28 U.S.C. § 2283. Its ruling would serve primarily to permit federal courts to issue injunctions of this very sort. *See Mikulski*, 501 F.3d at 568 (in construing federal jurisdiction, courts may not disturb "congressionally approved balance of federal and state judicial responsibilities").

Litigation may in some contexts constitute the equivalent of "regulation." But recognizing it as such for jurisdictional purposes undermines important limitations upon the type of cases that belong in federal court, including the bar against establishing jurisdiction by way

-39-

of a defense.  This rule doomed the entirety of the Plaintiffs' case.  The district court erred in exercising jurisdiction over their request for injunctive relief.

## CONCLUSION

The district court correctly dismissed this lawsuit, although it should have done so exclusively on jurisdictional grounds. The Court should

- affirm dismissal of the lawsuit; but

- reverse the district court's denial of Cleveland's Motion to Dismiss with respect to the Plaintiffs' request for injunctive relief, and hold that no jurisdiction exists over this aspect of the case.

/s/ - Joshua R. Cohen

| | |
|---|---|
| Joshua R. Cohen (0032368) | Robert J. Triozzi, Dir. (0016532) |
| jcohen@crklaw.com | rtriozzi@city.cleveland.oh.us |
| **Cohen Rosenthal & Kramer LLP** | Gary S. Singletary (0037329) |
| The Hoyt Block Building – Ste. 400 | gsingletary@city.cleveland.oh.us |
| 700 West St. Clair Avenue | **City of Cleveland Law Dept.** |
| Cleveland, Ohio 44113 | Cleveland City Hall |
| (216) 781-7956 **(Telephone)** | 601 Lakeside Avenue- Room 106 |
| (216) 781-8061 (**Facsimile**) | Cleveland, Ohio 44114 |
| | (216) 664-2800 **(Telephone)** |
| | (216) 664-2663 **(Facsimile)** |

Mark A. Stanton (007919)
hollie@mghslaw.com
**Short Shepherd & Stanton**
Rockefeller Building – Ste. 1300
614 Superior Avenue NW
Cleveland, Ohio 44113
(216) 687-0725 **(Telephone)**
(216) 664-6999 **(Facsimile)**

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,826 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using WordPerfect 14 with 12.5 point Book Antiqua font.

/s/ - Joshua R. Cohen
Joshua R. Cohen
Attorney for Appellee and Cross-Appellant

-42-

## CERTIFICATE OF SERVICE

I certify that on January 3, 2011, a copy of this Brief was served on counsel for the Plaintiffs-Appellants by e-mail through the CM/ECF system.

/s/ - Joshua R. Cohen
Joshua R. Cohen
Attorney for Appellee and Cross-Appellant

## DESIGNATION OF RECORD

RECORD ENTRY
<u>NUMBER</u>

| | |
|---|---|
| RE#29 | Amended Complaint |
| RE #31 | Motion to Dismiss Amended Complaint |
| RE#32 | Brief in Support of Motion to Dismiss Amended Complaint |
| RE #34 | Opposition to Motion to Dismiss Amended Complaint |
| RE #36 | Reply Memorandum in Support of Motion to Dismiss Amended Complaint |
| RE #37 | Motion for Leave to File Surreply in Opposition to Motion to Dismiss Amended Complaint |
| RE #38 | Memorandum Opinion |

## ADDENDA

**PAGE**

STATE COMPLAINT.....................    A-1

UNPUBLISHED DECISIONS.......    A-36

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **CITY OF CLEVELAND** <br> 601 Lakeside Avenue <br> Cleveland, Ohio 44114 <br><br> Plaintiff, <br><br> vs. <br><br> **JP MORGAN CHASE BANK, NA** <br> 1111 Polaris Parkway <br> Columbus, Ohio 43240 <br><br> – and -- <br><br> **AMERIQUEST MORTGAGE SECURITIES, INC.** <br> 1100 Town & Country Road – Suite 1100 <br> Orange, California 92668 <br><br> – and – <br><br> **ARGENT MORTGAGE CO. LLC** <br> c/o National Registered Agents <br> 145 Baker Street <br> Marion, Ohio 43302 <br><br> – and – <br><br> **BANK ONE, N.A.** <br> 1111 Polaris Parkway <br> Columbus, Ohio 43240 <br><br> – and – <br><br> **BEAR, STEARNS & CO., INC.** <br> c/o CT Corporation Systems <br> 1300 East Ninth Street <br> Cleveland, Ohio 44114 <br><br> – and – | Case No.:_____ <br><br><br><br><br> Judge: BRIAN J CORRIGAN <br><br> CV 08 668608 |

A-1

CITIFINANCIAL, INC.                              )
c/o CT Corporation Systems                       )
1300 East Ninth Street                           )
Cleveland, Ohio 44114                            )
                                                 )
        – and –                                  )
                                                 )
CITIGROUP GLOBAL MARKETS, INC.                   )
399 Park Avenue                                  )
New York, New York 10022                         )
                                                 )
        – and –                                  )
                                                 )
CITIMORTGAGE, INC.                               )
c/o CT Corporation Systems                       )
1300 East Ninth Street                           )
Cleveland, Ohio 44114                            )
                                                 )
        – and –                                  )
                                                 )
COUNTRYWIDE HOME LOANS, INC.                     )
4500 Park Granada                                )
Calabasas, California 91302                      )
                                                 )
        – and –                                  )
                                                 )
COUNTRYWIDE SECURITIES CORP.                     )
4500 Park Granada                                )
Calabasas, California 91302                      )
                                                 )
        – and –                                  )
                                                 )
CREDIT SUISSE FIRST BOSTON LLC                   )
Eleven Madison Avenue – 10th Floor               )
New York, New York 10010                         )
                                                 )
        – and –                                  )
                                                 )
DEUTSCHE BANK NATIONAL                           )
TRUST CO.                                        )
1761 East St. Andrew Place – 2nd Floor           )
Santa Ana, California 92705                      )
                                                 )
        – and –                                  )

-2-

A-2

DEUTSCHE BANK SECURITIES, INC.  )
60 Wall Street                  )
New York, New York 10005        )
                                )
    – and–                      )
                                )
GMAC MORTGAGE LLC               )
(fka GMAC Morgtage Corporation) )
1100 Virginia Drive             )
Fort Washington, Pennsylvania 19034 )
                                )
    – and –                     )
                                )
GOLDMAN SACHS & CO.             )
85 Broad Street                 )
New York, New York 10004        )
                                )
    – and –                     )
                                )
HOUSEHOLD REALTY CORP.          )
c/o CT Corporation Systems      )
1300 East Ninth Street          )
Cleveland, Ohio 44114           )
                                )
    – and  –                    )
                                )
HSBC BANK (USA), N.A.           )
1105 N. Market Street           )
Wilmington, Delaware 19801      )
                                )
    – and –                     )
                                )
HSBC MORTGAGE SERVICES, INC.    )
c/o CT Corporation Systems      )
1300 East Ninth Street          )
Cleveland, Ohio 44114           )
                                )
    – and –                     )
                                )
HSBC SECURITIES (USA), INC.     )
452 Fifth Avenue                )
New York, New York 10018        )
                                )
    – and –                     )

-3-

A-3

**LASALLE BANK, N.A.**                      )
135 South LaSalle Street                    )
Chicago, Illinois 60603                     )
                                            )
        – and –                             )
                                            )
**LEHMAN BROTHERS, INC.**                   )
3 World Financial Center                    )
New York, New York 10285                    )
                                            )
        – and –                             )
                                            )
**MERRILL LYNCH, PIERCE, FENNER**           )
**& SMITH INCORPORATED**                    )
c/o CT Corporation Systems                  )
1300 East Ninth Street                      )
Cleveland, Ohio 44114                       )
                                            )
        – and –                             )
                                            )
**MORGAN STANLEY & CO., INC.**              )
c/o CT Corporation Systems                  )
1300 East Ninth Street                      )
Cleveland, Ohio 44114                       )
                                            )
        – and –                             )
                                            )
**NOVASTAR MTG, INC.**                      )
c/o CT Corporation Systems                  )
1300 East Ninth Street                      )
Cleveland, Ohio 44114                       )
                                            )
        – and –                             )
                                            )
**RESIDENTIAL CAPITAL LLC**                 )
8400 Normandale Blvd.                       )
Minneapolis, Minnesota 55437                )
                                            )
        – and –                             )
                                            )
**WELLS FARGO, N.A. (MINNESOTA)**           )
Sixth and Marquette                         )
Minneapolis, Minnesota 55479                )
                                            )

-4-



```
        – and –                              )
                                             )
WELLS FARGO HOME                             )
MORTGAGE, INC.                               )
1 Home Campus                                )
Des Moines, Iowa 50308                       )
                                             )
        – and –                              )
                                             )
CORPORATE JOHN DOES                          )
DEFENDANTS #1–#10                            )
                                             )
        Defendants.                          )
                                             )
                                             )
```

## COMPLAINT
### (Jury Demand Endorsed Hereon)

## INTRODUCTION

1.    The City of Cleveland sits at the epicenter of a mortgage foreclosure crisis triggered by subprime lenders and the monied interests that support them.  Lenders made high-costs loans available by the thousands to unqualified borrowers who had no legitimate chance of keeping up with payments over the long term.  A rash of defaults inevitably followed, and the ensuing foreclosures left many homes abandoned and boarded up, transforming them into eyesores, fire hazards, and easy prey for looters and drug dealers in search of a place to conduct their business.

2.    Entire streets, blocks, and neighborhoods in Cleveland succumbed to this fate, displacing both homeowners and tenants of absentee landlords who had acquired their property with subprime loans. Seemingly

overnight, the spate of foreclosures vanquished or reversed the successes that had established Cleveland as a national leader in neighborhood revitalization.

3.    The epidemic of foreclosures has devalued not only the homes directly affected but surrounding properties as well, deeply depleting Cleveland's tax base. The City has also strained to cover the immediate, tangible costs imposed upon it by the crisis, including increased fire and police expenditures associated with vacant properties, demolition costs, and the like.

4.    Subprime lending abuses have inflicted this same kind of damage upon cities across the United States. Cleveland's predicament, however, remains distinctive and unique – and not only because its foreclosure rate surpasses those experienced elsewhere by a significant margin. The City's economy and housing situation differed significantly from the rest of the country's at the time subprime lending reached its peak. The disparities made mass foreclosures the only possible outcome of flooding the local market with subprime mortgages, even if doing likewise in other cities created no such apparent risk.

5.    With respect to Cleveland, the purveyors of subprime mortgages could have and should have foreseen (and in all likelihood actually did foresee) a foreclosure crisis as the inescapable consequence of their conduct. Forced to clean up the resulting mess, the City

-6-

has sustained hundreds of millions of dollars in damages, in the manner described above.

6.     Responsibility for Cleveland's plight rests principally with subprime's so-called "securitizers" – investment banking firms from Wall Street and elsewhere that actually provided the cash used to make loans. The securitizers accomplished this largely by buying the subprime mortgages procured from borrowers: Lenders would make subprime loans with proceeds received from the sale of mortgages from earlier deals. Through this cycle, Wall Street financed the subprime boom that took place in Cleveland and across the country.

7.     Investment bankers bought subprime mortgages for use as collateral in the formation of new mortgage-backed securities. This type of investment became the darling of Wall Street, given the substantial returns it generated for purchasers – in keeping with the steep interest rates that borrowers were paying on the subprime mortgages that backed the securities.

8.     Securitizers typically paid themselves astronomical fees in putting together new offerings of mortgage-backed securities. Their appetite for mortgage-backed securities became so voracious that securitizers explicitly countenanced loans made to borrowers either on financially irrational terms or without any information to corroborate the borrowers'

-7-

wherewithal to pay – anything to generate new mortgages for the creation of still more mortgage-backed securities.

9.    The indiscriminate propagation of subprime loans by securitizers and the corresponding foreclosures constitute a public nuisance under Ohio common law, which entitles the City to recoup the damages it suffered as a result. The City also may recover punitive damages, given the egregiousness of the Defendants' wrongdoing.

10.    The City has various alternative claims. R.C. 715.261 per-mits it to sue securitizers and their affiliates for the "total costs" incurred in demolishing or tending to foreclosed properties that these companies came to own through the foreclosure process.

11.    The Ohio Corrupt Activities Act also affords the City a right to recover "triple damages" sustained in connection with foreclosures that "securitizers" and their affiliates effected under false pretenses. Under Ohio law, the right to initiate foreclosure proceedings belongs exclusively to the party that currently owns the mortgage in default. The Defendants, how-ever, pervasively disregarded this mandatory requirement. In each instance where they did so, the Corrupt Activities Act entitles the City to three times its losses resulting directly or indirectly from this unlawful conduct.

## THE CITY OF CLEVELAND

12.    With approximately 460,000 residents, Cleveland ranks as the second largest city in Ohio.

13.    Between 2002 and 2007, the number of foreclosures effected in the City increased by *MORE THAN 7,000 PERCENT*:



14.    This surge was a distinctly subprime phenomenon. Over the past three years, more than 80 percent of all foreclosures in Cleveland involved subprime mortgages. The subprime foreclosure rate exceeded the rate on conventional loans by more than 800 percent. A full third of the subprime loans made in Cleveland during 2005 have already ended in default and foreclosure.

15.    The rash of foreclosures has severely depressed the value of Cleveland residences. During the first six months of 2007, the median home sale price in Cleveland dropped by more than 75 percent, from $62,000 to $15,500.

## CONNECTION BETWEEN
## DEFENDANTS AND CLEVELAND FORECLOSURES

16.    Each of the Defendants played a role in specific subprime foreclosures in Cleveland, either by participating in the securitization of the underlying mortgage or by filing for and consummating the fore-closures themselves.

### THE DEFENDANTS

I.    **JP Morgan Chase Bank, NA**

17.    Defendant JP Morgan Chase Bank resides in Ohio for jurisdictional purposes. Based upon information and belief, the City alleges that this Defendant has securitized subprime mortgages within its borders that have ended in foreclosure.

18.    Moreover, since 2000, JP Morgan Chase Bank has effected more than 580 foreclosures in the City of Cleveland, while its predecessor, Defendant Bank One, NA effected more than 730. Bank One also resides in Ohio for jurisdictional purposes. Based upon information and belief, the City alleges that JP Morgan Chase Bank and Bank One lacked legitimate title to the underlying mortgage in at least some of these foreclosure actions.

19.    Prior to filing this lawsuit, the City of Cleveland unsuccessfully petitioned the United States District Court for leave to sue JP Morgan Chase Bank as part of a case pending in that forum.

-10-

The City has therefore included this Defendant as part of the current litigation.

II.    **Defendants That Securitized Subprime Mortgages**

20.    Based upon information and belief, the City alleges that the following Defendants securitized subprime mortgages in Cleveland (either directly or as underwriter) that ended in foreclosure:

21.    Based in Orange, California, Defendant Ameriquest Mortgage Securities, Inc. was part of the Ameriquest family of companies.

22.    Defendant Bear Stearns & Co., Inc. formerly ranked as one of the nation's preeminent investment banking and securities brokerage firms. The company was headquartered in New York City.

23.    Defendant Citigroup Global Markets, Inc. belongs to the Citigroup family of companies. It has its offices in New York City.

24.    Based in California, Defendant Countrywide Securities Corporation was the securitizing arm of the Countrywide family of companies.

25.    Defendant Credit Suisse First Boston LLC also has its headquarters in New York City. The company constitutes part of an international financial conglomerate and has underwritten billions in offerings of securities backed by subprime mortgages.

26.    Based in New York City, Defendant Deutsche Bank Securities, Inc. underwrote billions in securities backed by subprime mortgages during the period pertinent to this lawsuit.

27.    Defendant Goldman Sachs & Co. participates in the securitization process principally as an underwriter. The company has its offices in New York City.

28.    Defendant HSBC Securities (USA), Inc. has underwritten billions in securities backed by subprime mortgages. The company belongs to an international financial conglomerate and has its headquarters in New York City.

29.    Defendant JP Morgan Chase Securities, Inc. also has underwritten billions in securities backed by subprime mortgages. The company has its offices in New York City.

30.    Defendant Lehman Brothers, Inc. participates in the securitization process principally as an underwriter. The company has its offices in New York City.

31.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated also has its headquarters in New York City. Merrill Lynch has securitized billions in subprime mortgages, either directly or as an underwriter.

32.    Defendant Morgan Stanley & Co., Inc. participates in the securitization process principally as an underwriter. The company has its offices in New York City.

-12-

33.    Based in Kansas City, Missouri, Defendant Novastar Mortgage, Inc. has securitized billions of dollars in subprime mortgages.

34.    Defendant Residential Capital LLL, formerly known as Residential Capital Corporation, has its offices in Minneapolis. This company, too, has engaged extensively in subprime securitizations.

35.    Corporate John Doe Defendants #1 through #10 are affiliates of one or more of the previously named Defendants that joined in the securitization of subprime mortgages in Cleveland that ended in foreclosure.

III.    **Defendants That Abused Foreclosure Process**

36.    Based upon information and belief, Cleveland alleges that the following Defendants abused the judicial process in at least certain instances in effecting foreclosures within the City:

37.    Defendants Argent Mortgage Co. LLC belongs to the Ameriquest family of companies, which at one time ranked among the nation's most active subprime lenders and securitizers. Argent had headquarters in Orange, California. Since 2000, the company effected approximately 350 foreclosures in the City of Cleveland.

38.    Defendants CitiFinanacial, Inc. and CitiMortgage, Inc. are Citigroup companies from outside Ohio for jurisdictional purposes. Since 2000, CitiFinancial and CitiMortgage have each effected more than 220 foreclosures in the City of Cleveland.

39.    Based in California, Defendant Countrywide Home Loans, Inc. has effected more than 500 foreclosures in the City of Cleveland since 2000.

40.    Defendant Deutsche Bank National Trust Company is a national banking association with its principal offices in Irvine, California. Since 2000, Deutsche Bank National Trust Company has effected more than 1,800 foreclosures in the City of Cleveland.

41.    A corporation from outside Ohio, Defendant GMAC Mortgage Corporation effected more than 480 foreclosures in the City of Cleveland since 2000.

42.    Defendants Household Realty Corp., HSBC Bank (USA), N.A., and HSBC Mortgage Services, Inc. each constitutes part of the same international financial conglomerate. All three entities come from outside Ohio for jurisdictional purposes. Since 2000, Household Realty Corp., HSBC Bank (USA), N.A., and HSBC Mortgage Services, Inc. have together effected nearly 600 foreclosures in the City of Cleveland.

43.    Based in Chicago, the LaSalle National Bank has effected more than 830 foreclosures in Cleveland since 2000.

44.    Defendant Wells Fargo Bank, NA (Minnesota) is a national bank headquartered in Minneapolis which has effected more than 400 foreclosures in the City of Cleveland since 2000. Its affiliate, Wells Fargo Home Mortgage Inc., is a corporation organized under Iowa law that since 2000 has effected nearly 80 foreclosures in the City of Cleveland.

-14-

## FACTUAL BACKGROUND

I.     **Sub-Prime Lending**

45.     As its name implies, sub-prime lending involves transactions made at relatively high rates of interest, typically to borrowers with "high credit risk" who do not qualify for conventional loans.     Sub-prime borrowing typically has higher "up-front costs" like application fees and application fees, as well as higher mortgage insurance rates and more costly late charges and prepayment penalties.

46.     Sub-prime financing became increasingly popular during the 1990s – from 1994 to 2000, sub-prime lending grew from $35 million, representing five percent of all originations, to $140 million, representing 13.4 percent the total.  This increase represents an average annual growth rate of 26 percent.

47.     The sub-prime explosion continued into the new millennium. Between 2000 and 2006, the number of sub-prime loan originations jumped by more than 250 percent, to more than 3.2 million.

II.     **The Securitization of Subprime Mortgages**

48.     As indicated above, Wall Street's love affair with mortgage-backed securities largely spurred the unprecedented surge in sub-prime lending. Mortgage-backed securities comprise a collection of mortgages that originators resell to the issuer of the securities. Investors buy bonds from the

-15-

issuer, which uses the cash flow generated by the mortgage pools to pay interest and ultimately to return investors' capital.

49.    Mortgages undergo a series of transfers involving multiple entities before the issuer acquires them. This separation between the issuer and entity that originated the loans represents the key component to securitization, since without it, the originator could go bankrupt and claim the loans as part of its estate.

50.    The essential participants in the securitization of sub-prime mortgages include

**THE ORIGINATOR**, which takes and processes the loan application and handles all steps through disbursement of funds to borrowers.

**THE MORTGAGE BROKER**, which brings prospective borrowers together with prospective lenders (originators);

**THE DEPOSITOR**, a "special purpose entity" that buys multiple mortgages from originators and pools them together for sale to **TRUST**;

**THE TRUST**, which buys the mortgages from the **DEPOSITOR** and uses them as collateral in issuing mortgage-backed securities;

**THE UNDERWRITERS**, which sell the mortgage-backed securities to investors; and

**THE SERVICER**, which collects payments from borrowers on behalf of **TRUST** and handles other administrative tasks.

-16-

A-16



-17-

A-17

51.    Approximately two-thirds of all mortgage debt in the United States has undergone securitization.  A substantial portion of this total comes from government-sponsored entities like the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae").  As a general rule, however, Freddie Mac and Fannie Mae deal in "conforming mortgages" that meet certain restricted "borrower quality characteristics and loan-to-value ratios."

52.    In contrast, Wall Street has relied upon sub-prime mortgages to fund their mortgage-backed offerings.  These securities offer investors higher rates of return than those backed by "conforming mortgages," since they involve higher rates of interest.  They also involve higher degrees of risk, since sub-prime borrowers (with their relatively poor credit)  by definition default with greater frequency than recipients of loans at prime rate.

III.    **Wall Street's Preeminence in the Sub-Prime Market**

53.    Wall  Street's  involvement  in  the  sub-prime  market encompassed more than just the purchase and pooling of mortgages to back new securities offerings. The investment bankers also provided lenders with lines of credit and other means of financing required to accommodate the dramatic increase in the number of mortgages they were procuring.

54.    Securitization eventually became the key source of capital for sub-prime lenders.  The process enabled them to convert mortgages quickly

into funds to make new loans. Investment banking firms thus assumed the central role in the cycle of financing that gave rise to the sub-prime mortgage boom:

(1) **WALL STREET** made financing available to sub-prime lenders, which

(2) used the cash to make sub-prime loans to consumers, then

(3) sold the related mortgages back to **WALL STREET**, which

(4) packaged and resold them to investors in the form of mortgage-backed securities, and

(5) used the proceeds to repeat the process.

55.     Mortgage-backed securities funded lavish pay days (by even Wall Street standards) for the firms engaged in this business. As indicated above, investment bankers displayed no shyness about the fees they charged in connection with MBS offerings. Those charges translated into six- and seven-figure bonuses for individual executives responsible for particular clients and deals.

56.     The Wall Street firms kept the gravy train rolling by accounting for a substantial portion of the investor demand for mortgage-backed securities. They did so principally through their proprietary trading programs and hedge funds that the firms created and managed.

57.     Wall Street necessarily held significant influence over sub-prime lenders, given its concurrent positions as financier, underwriter, and

-19-

A-19

investor in the sub-prime market. The firms used their preeminent status to set the standard that lenders applied to determine who did (almost everyone) and did not (almost no one) qualify for sub-prime financing.

IV.    **The Phenomenon of Money-Seeking-Borrowers**

58.    In 2003, a fundamental shift took place in how Wall Street constructed their securities offerings backed by sub-prime mortgages. By that juncture, the demand for this type of investment had grown so significantly that the offerings essentially involved "money seeking borrowers." The firms, in other words, began directing originators on the type of loans to procure in which amounts in order to fill out the pool needed as collateral for each new security.

59.    This process subverted the normal operation of the mortgage market and inevitably led to the abandonment of meaningful underwriting standards. Even borrowers unlikely to meet their obligations would have to receive loans in order for the supply of sub-prime mortgages to keep pace with Wall Street's burgeoning demand. Lenders devised various new products to bring in the necessary volume of business:

> **Hybrid Adjustable Rate Mortgages,** known as "ARMS," that carry low fixed teaser rates that jump to much higher adjustable rates after two or three years

> **Low- and No-Documentation Loans,** which borrowers can obtain without having to verify their financial resources.

-20-

**Interest-Only Loans**, which obligate borrowers to pay interest only for a specified period, when the principal becomes due.

60.     Each of these arrangements significantly increased the intrinsically high risk of sub-prime mortgages, which in all instances match loans with higher-than-average interest rates with borrowers having less-than-average credit. The booming real estate market in the United States principally explained Wall Street's willingness to ignore these fundamental considerations, regardless of the terms that sub-prime lenders offered to lure new borrowers.

61.     Property values in the United States were generally on the rise during the early part of this decade. As a result, the collateral securing new loans was generally appreciating in value – so much so, that default and foreclosure would not necessarily result in a loss.

62.     Confidence ran so high that Wall Street believed it could turn a blind eye when lenders and brokers originated loans that made no economic sense, either because they involved borrowers with especially poor credit histories or because the amount borrowed far exceeded the current value of the home. These mortgages would ultimately prove good investments for the holder, so long as the housing market held, since the value of the collateral would eventually appreciate well beyond the face value of the loan.

-21-

A-21

## V.    Cleveland's Unique Economic Situation

63.    Whatever merit this hypothesis otherwise may have held, it never had any applicability to the situation in Ohio, or to Cleveland in particular. As illustrated below, property values never appreciated in the City anywhere near the extent to which they did elsewhere. Moreover, the high rate of poverty along with the general sluggishness of the economy and limited employment opportunities both increased the likelihood of defaults on subprime loans and diminished the possibility of attracting new buyers when the rush of foreclosures inevitably hit.

64.    For one thing, property values never skyrocketed in the City as they did elsewhere in the nation, as the following graph reflects:

### CLEVELAND PROPERTY VALUES vs. NATIONAL AVERAGE



-22-

65.    Participants in the subprime mortgage industry necessarily would have known about Cleveland's exclusion from the national housing bubble. They also would have known about the City's struggling Rust-Belt economy, the fading prominence of the manufacturing sector, and Cleveland's difficulties and the beginning of this decade in attracting a meaningful replacement.

66.    According to the U.S. Conference of Mayors, Cleveland's Gross Metropolitan Product grew at the paltry annual rate of 4.2 percent over the ten-year period ending in 2003. This placed the City 243rd among major metropolitan economies in the United States.

67.    Other studies confirmed Cleveland's serious economic problems during the subprime lending craze. According to the Brookings Institution, the City ranked at or near the bottom when it came to the average household income earned by its residences:

| | 2000 | | | 2005 | | | 2006 | | |
|---|---|---|---|---|---|---|---|---|---|
| | NO | PCT | RANK | NO | PCT | RANK | NO. | PCT | RANK |
| LOW (>$20,000) | 75,518 | 39.6 | 3 | 74,033 | 41.6 | 2 | 65,067 | 38.6 | 2 |
| MODERATE ($20,000 -$34,999) | 44,999 | 23.6 | 7 | 41,772 | 23.5 | 4 | 39,547 | 23.5 | 6 |
| MIDDLE ($35,000-$59,999) ($35,000-$49,999) (2000) | 28,814 | 15.1 | 78 | 33,034 | 18.6 | 98 | 28,814 | 21.6 | 78 |
| UP. MIDDLE ($60,000-$99,999) ($50,000-$74,999) (2000) | 25,592 | 13.4 | 95 | 21,625 | 12.2 | 96 | 19,342 | 11.5 | 99 |
| HIGH ($100,000+) ($75,000+) (2000) | 15,802 | 8.3 | 100 | 7,353 | 4.1 | 98 | 8,103 | 4.8 | 100 |

Gross numbers refer to households.
Rankings place Cleveland among 100 largest cities in United States.

-23-

| | 2000 | | 2005 | | 2006 | |
|---|---|---|---|---|---|---|
| | AMOUNT | RANK | AMOUNT | RANK | AMOUNT | RANK |
| MEDIAN INCOME (BY HOUSEHOLD) | $26,735 | 98 | $24,105 | 100 | $26,535 | 100 |
| CHANGE MED. INCOME (SINCE 2000) | | | 12.1% | 24 | | |
| POVERTY RATE | 26.3% | 5 | 32.4% | 1 | 27.0% | 6 |

Rankings place Cleveland among 100 largest cities in United States.

68.    Not surprisingly, given these considerations, foreclosure had already become a serious problem in Cleveland early in this decade, even while residential real estate remained the hottest of commodities elsewhere in the United States.

69.    Securitizers could hardly claim ignorance of these economic realities, which should have eliminated Cleveland as a market for wide-spread subprime lending.  In fact, these Defendants were setting the stage for financial catastrophe by:

  (1)  making credit available to borrowers at higher-than-average interest rates, notwithstanding their worse-than-average credit histories;

  (2)  abandoning underwriting standards that protected both borrowers and lenders;

  (3)  using "teaser" rates and similar tactics to hide the true burden of borrowing;

  (4)  doing so under economic conditions that afforded borrowers with little economic opportunity or mobility; and

-24-

(5) doing so in a real estate market that remained essentially frozen, even while boom times continued elsewhere.

70.    These circumstances predetermined the harsh results of the subprime blitz directed at Cleveland. As indicated above, foreclosures in the City have increased exponentially since 2002.

71.    An average of 20 Cleveland homeowners faced the grim reality of foreclosure each day during 2007. The epidemic affected almost all parts of the City:



City of Cleveland - Foreclosures

Foreclosures 1-1 to 11-30-07 (7037)
Foreclosures 2006 (7369)
Foreclosures 2005 (1926)
Foreclosures 2004 (397)
Foreclosures 2003 (182)
Foreclosures 2002 (111)

December 10, 2017

City of Cleveland
Department of Community Development

-26-

72.     Cleveland currently has approximately 22,000 properties left vacant as a result of foreclosure, out of a grand total of approximately 395,000 (5.57 percent).

## VI.    Abuse of Foreclosure Process

73.     If a borrower violates his obligations under a mortgage, the mortgage holder may sue in foreclosure.  A party, however, can prosecute such actions if and only if it owns the mortgage and the note at the time the foreclosure case begins.  Claims become subject to dismissal if the plaintiff does not plead or prove this fundamental point.

74.     Securitized mortgages supposedly end up belonging to a trust, which (as owner) would have exclusive standing to sue in foreclosure. Typically, however, title to the note and mortgage never reaches the trust – through sloppiness or otherwise, the entities involved in the securitization process fail to transfer ownership in keeping with the choreographed procession of transactions.

75.     In these situations, trustees suing in foreclosure falsely inform the court that they own the note and mortgage in default.  Other cases involve even more brazen violations of the truth – servicers prosecute foreclosure actions in their own name, representing themselves as the owners of the notes and mortgages in question, even though they

-27-

do not even theoretically hold title at any point in the securitization process.

76.     Plaintiffs' lack of ownership goes largely undetected, given the sizeable percentage of foreclosure cases that proceed on an uncontested basis.

77.     Based upon information and belief, the City alleges that JP Morgan Chase Bank, Bank One, and the Defendants identified in ¶36 through ¶48 above have all partaken of these abusive procedures in foreclosing upon Cleveland properties.

VII.    **Damages Suffered by the City of Cleveland**

78.     The City of Cleveland was an innocent bystander with respect to the influx of subprime money within its borders. It received none of the financial gain the Defendants extracted in promoting this type of financing.

79.     Having had absolutely nothing to gain from the subprime industry, Cleveland now must deal with the devastation it has inflicted upon the City. Each and every foreclosure creates certain tangible costs for Cleveland, particularly if the property remains vacant for any extended period of time. As indicated above, these may include increased expenditure for fire and police protection, or the cost of demolition. In any individual case, the City's expenses may range well into five figures.

-28-

80.    The sub-prime mortgage crisis has also ravaged Cleveland's property-tax revenues, the amount of which turns upon the appraised value of real estate in the City.

81.    Foreclosures decrease the value not only of the affected homes, but surrounding properties as well.  The magnitude of this spillover effect is tremendous – a study recently released by the Center for Responsible Lending determined that homes in Cuyahoga County collectively depreciated more than *$462 MILLION* due to their proximity to foreclosed property.  Cleveland residents have already begun challenging assessments on their homes in light of the blight inflicted by the foreclosure crisis.

82.    The municipal cost of foreclosure has long been known.  For instance, in June 2000, the United States Treasury Department and the Department of Housing and Urban Development issued a joint report on predatory lending.  The report addresses the elevated rate of sub-prime foreclosures, and their role in hastening the deterioration of various urban communities. Various economists and academicians had also extensively addressed this same topic.  Just as the Defendants could have and should have foreseen the mass foreclosures they were causing in Cleveland, they could have and should have anticipated the damages the City would suffer as a result of their actions

-29-

## COUNT ONE
### [Public Nuisance]

83.    The City incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

84.    JP Morgan Chase Bank and the Defendants identified in ¶20 through ¶35 of this Complaint (including the corporate John Doe Defendants) are liable to the City of Cleveland for public nuisance for their respective roles in proliferating toxic sub-prime mortgages within its borders, under circumstances that made the resulting spike in foreclosures a foreseeable and inevitable result.

85.    The City suffered damage as the direct and proximate result of the Defendants' unlawful conduct, including (a) the cost of monitoring, maintaining, and demolishing foreclosed properties, and (b) decreased tax revenues resulting from the depreciated value of the affected homes and all surrounding real estate.

86.    The Defendants face liability for both punitive and compensatory damages under this claim for public nuisance, given the actual malice they manifested in committing the tort.

## COUNT TWO
### [R.C. 715.261]

87.    The City incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

-30-

88.    R.C. 715.261 empowers the City of Cleveland to bring civil litigation to recover "the total cost of removing, repairing, or securing insecure, unsafe, structurally defective, abandoned, deserted, or open and vacant buildings or other structures." Liability extends to the owner of the property in question.

89.    Pursuant to R.C. 715.261, the following Defendants owe Cleveland the "total cost" of demolishing residences that they owned in the City:

| Defendant | Parcel No. | Address |
|---|---|---|
| Bank One | 119-27-070 | 8011 Central Ave. |
| **CitiFinancial** | **113-13-015** | 15713 Damon Ave. |
| CitiMortgage | 116-22-020 | 11612 Burnside Ave. |
| **Countrywide Home Loans** | **016-10-039** | 526 Arkansas Ave. |
| | **108-17-009** | 444 East 109th St. |
| | **133-05-109** | 3606 East 76th St. |
| Deutsche Bank Nat. Trust | 111-02-087 | 523-25 East 114th St. |
| | 132-06-106 | 6612 Sebert Ave. |
| | 134-05-065 | 9407 Aetna Ave. |
| | 139-01-015 | 3532 East 144th St. |
| **GMAC Mortgage Co.** | **006-25-050** | 7706 Berry Ave. |
| | **020-02-060** | 13440 Kirton Ave. |
| | **111-01-039** | 560 East 144th St. |
| | **111-02-108** | 460 East 115th St. |
| | **127-23-162** | 9717 Union Ave. |
| | **128-13-144** | 10014 Lamontier Ave. |
| JP Morgan Chase Bank | 108-24-049 | 785 East 100th St. |
| | 115-01-039 | 837 East 141st St. |
| | 120-08-080 | 1460 East 111th St. |
| | 131-37-056 | 3676 East 59th St. |
| | 133-15-033 | 7907-09 Jones Ave. |
| **LaSalle Bank** | **016-23-069** | 3407 West 45th St. |
| | **105-21-071** | 1106 East 63rd St. |
| | **108-26-137** | 10532 Everton |
| | **115-24-061** | 797 East 156th St. |
| | **116-09-057** | 15517 Saranac Rd. |
| | **121-17-053** | 2293 East 97th St. |

-31-

| Defendant | Parcel No. | Address |
|---|---|---|
| | 126-18-020 | 9521 Buckeye Rd. |
| | 138-11-087 | 13301 Ferris Ave. |
| | 138-15-018 | 4222 East 128th St. |
| Wells Fargo Bank | 109-22-099 | 1135-37 East 112th St. |
| | 115-02-011 | 876 East 144th St. |
| | 121-32-082 | 11020 Mt. Overlook Ave. |
| | 138-15-006 | 12408 Miles Ave. |
| Wells Fargo Bank (Min.) | 104-14-150 | 1210 East 60th St. |

## COUNT THREE
## [Corrupt Activities]

90.     The City incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

91.     The City of Cleveland brings this claim under Ohio's Corrupt Activities Act against JP Morgan Chase Bank, Bank One, and the Defendants identified in ¶36 through ¶44 of this Complaint.

92.     Defendants subvert the integrity of the judicial process by initiating foreclosure proceedings with pleadings that falsely claim title to the underlying mortgage and the corresponding promissory note. The City is not trying to undo the judgments rendered in these cases. The fact remains, however, that the Defendants resorted to unlawful means in procuring the foreclosures that have inflicted such harm on the City of Cleveland.

93.     In particular, the Defendants violate R.C. 2921.12(A) each time they inaccurately portray them as owners of the mortgage and note giving

-32-

A-32

rise to a new foreclosure filing. Violations of this provision in turn qualify as "corrupt activity" under Ohio's Corrupt Activities Act. Liability arises under the latter statute when a defendant acquires an interest in real property through a "pattern" of "corrupt activity." A "pattern," in turn, encompasses two or more separate and unrelated incidents of proscribed conduct.

94.     These provisos speak squarely to the actions of the Defendants, which have repeatedly and systematically breached R.C. 2921.12(A) by filing bogus foreclosure complaints for the purpose of acquiring an interest in the affected real estate.

95.     Liability under the Corrupt Activities Act extends to parties indirectly injured by the offending conduct. This includes the City of Cleveland, which suffered the damages described above from the foreclosures unlawfully effected by the Defendants.

WHEREFORE, the City of Cleveland respectfully requests the following relief:

- On Count One, an award of compensatory damages in an amount exceeding $25,000, plus an award of punitive damages, in an amount established at trial;

- On Count Two, an award of the "total costs" associated with demolishing the residences identified in ¶89 of the Complaint;

- On Count Three, an award of triple damages, in an amount exceeding $25,000;

- an award of costs and attorneys fees; and

- any other relief that the Court deems just and equitable.

Joshua R. Cohen (0032368)
jcohen@crklaw.com
James B. Rosenthal (0062872)
jbr@crklaw.com
**Cohen Rosenthal & Kramer LLP**
The Hoyt Block Building – Ste. 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
(216) 781-7956 **(Telephone)**
(216) 781-8061 **(Facsimile)**

Robert J. Triozzi, Director (0016532)
rtriozzi@city.cleveland.oh.us
Gary S. Singletary (0037329)
gsingletary@city.cleveland.oh.us
Michael F. Cosgrove (0072795)
mcosgrove@city.cleveland.oh.us
**City of Cleveland Law Department**
Cleveland City Hall
601 Lakeside Avenue- Room 106
Cleveland, Ohio 44114
(216) 664-2800 **(Telephone)**
(216) 664-2663 **(Facsimile)**

Mark A. Stanton (007919)
hollie@mghslaw.com
**Short Shepherd & Stanton**
Rockefeller Building – Ste. 1300
614 Superior Avenue NW
Cleveland, Ohio 44113
(216) 687-0725 **(Telephone)**
(216) 664-6999 **(Facsimile)**

Andris G. Nikiforovs (0055400)
andyn@commhousingsolutions.org.
**Community Housing Solutions**
12114 Larchmere Boulevard
Cleveland, Ohio 44120
(216) 231-5815 **(Telephone)**
(216) 231-5845 **(Facsimile)**

Paul B. Bellamy (0005314)
pbbellamy@sbcglobal.net
Judith B. Goldstein (009655)
jgoldstein@equaljusticefoundation.com
**Equal Justice Foundation**
88 East Broad Street – Suite 1590
Columbus, Ohio 43215
(614) 221-9800 **(Telephone)**
(614) 221-9810 **(Facsimile)**

-34-

## JURY DEMAND

Pursuant to Civ. R. 38, the City of Cleveland respectfully demands

trial by jury on all eligible causes of actions and issues.

Joshua R. Cohen

-35-

2002 WL 31683675
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

COLONY INSURANCE COMPANY
v.

Glen HOLLEY d/b/a Holley Construction, Denise
Garrity Holley, wife of/and Mark E. Holley, Lisa
Ann Napolitano Muscarello and Thomas Hecker, Jr.

No. Civ.A.02-56.    Nov. 27, 2002.

Opinion

### ORDER AND REASONS

VANCE, J.

*1  Before the Court is the motion of defendants Glen Holley d/b/a Holley Construction, Denise Garitty Holley, and Mark E. Holley ("the Holleys") to dismiss plaintiff's complaint for declaratory judgment on abstention grounds. For the following reasons, the Court will STAY this case pending resolution of the state court proceedings.

### I. Background

Lisa Ann Napolitano Muscarello and Thomas G. Hecker, Jr. filed two lawsuits against the Holleys in state court as a result of their purchase of a home allegedly prone to flooding. On October 10, 2001, these two lawsuits were consolidated.

On August 21, 2001, the Holleys made demand on their insurer, Colony Insurance Company, for a defense and coverage. On September 14, 2001, Colony denied coverage but agreed to provide a defense under a reservation of rights. On January 8, 2002, Colony filed a complaint for declaratory judgment in this Court, naming the Holleys, Muscarello, and Hecker as defendants. On March 5, 2002, the Holleys filed a third-party demand against Colony in the state proceedings, asserting a claim for a defense and coverage. In August of 2002, the Holleys moved to dismiss Colony's complaint in this Court on the grounds of abstention.

Colony argues that the Holleys' motion to dismiss on abstention grounds is not a motion permitted under Federal Rule of Civil Procedure 12(b). The Court rejects this argument, as courts have traditionally entertained motions such as these under Rule 12(b), even though they are

not specifically mentioned in the Rule. *See, e.g., Wilton v. Seven Falls Co.,* 41 F.3d 934, 935 (5th Cir.1994); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1360 at 432, 438-42 (2d ed.1990). Even if Colony were correct, the Court still has broad discretion to dismiss or stay a declaratory judgment action *sua sponte. See Agora Syndicate, Inc. v. Robinson Janitorial Specialists, Inc.,* 149 F.3d 371, 373 (5th Cir.1998) (acknowledging without disapproval that district court dismissed declaratory judgment action *sua sponte* ); *State Farm Mutual Automobile Ins. Co. v. Daughdrill,* 702 F.2d 70, 71 (5th Cir.1983) (same); *Allstate Ins. Co. v. Employers Liability Assurance Corp., Ltd.,* 445 F.2d 1278, 1280 (5th Cir.1971); *Houston General Ins. Co. v. Taylor Lumber & Treating, Inc.,* 1997 U.S. Dist. LEXIS 1243, *1 (E.D.La.1997). Thus, the Court will consider the issue of whether to dismiss or stay Colony's declaratory judgment action.

### II. Discussion

A district court possesses "broad discretion to grant (or decline to grant) declaratory judgment." *Wilton v. Seven Falls Co. .,* 515 U.S. 277, 281, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995); *Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n, Inc.,* 996 F.2d 774, 778 (5th Cir.1993). Abstention is not mandatory in this case. Because Colony filed its complaint for declaratory relief before the Holleys sued Colony, this is not a case in which the declaratory defendant first raised the issue in state court against the declaratory plaintiff. Thus, the Court is not required to abstain pursuant to the factors outlined in *Travelers. See Travelers,* 996 F.2d at 776 (court may not consider the merits of a declaratory judgment action when (1) a declaratory defendant has previously filed a cause of action in state court against the declaratory plaintiff, (2) the state case involves the same issues as those involved in the federal case, and (3) the district court is prohibited from enjoining the state proceedings under the Anti-Injunction Act); *see also Essex Ins. Co. v. Grefer,* 2002 U.S. Dist. LEXIS 13466, *4 n. 1 (E.D.La.2002). The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. §§ 2201(a). The district court's discretion is broad, but it is not without limits. For example, the court may not dismiss a request for declaratory judgment relief on the basis of "whim or personal disinclination." *Travelers,* 996 F.2d at 778 (citing *Rowan Cos., Inc. v. Griffin,* 876 F.2d 26, 28-29 (5th Cir.1989)). To exercise its discretion, the Fifth Circuit requires the district

court to balance on the record the purposes of the Declaratory Judgment Act and the factors relevant to the abstention doctrine. *See id.*

*\*2* In discussing the district court's discretion to abstain from entertaining a declaratory judgment action, the Supreme Court in *Wilton* described the court's task as follows:

> In deciding whether to enter a stay, a district court should examine the scope of the pending state court proceeding and the nature of defenses open there. This inquiry, in turn, entails consideration of whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amendable to process in that proceeding.

515 U.S. at 283, 115 S.Ct. at 2141 (internal citations omitted). When another suit "involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court," a court's consideration of the declaratory judgment action may constitute "gratuitous interference." *Id.*

Before the Supreme Court decided *Wilton,* the Fifth Circuit adopted an abstention analysis in *Travelers* similar to that used in *Wilton.* The Fifth Circuit found the following factors to be relevant to the Court's determination of the abstention issue: (1) whether there is a pending state action in which all of the matters in controversy may be fully litigated; (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant; (3) whether the plaintiff engaged in forum shopping in bringing the suit; (4) whether possible inequities exist in allowing the declaratory plaintiff to gain precedence in time or to change forums; (5) whether the federal court is a convenient forum for the parties and witnesses; and (6) whether retaining the lawsuit in federal court would serve the purpose of judicial economy. *Travelers,* 996 F.2d at 778. Many district courts continue to consider the *Travelers* factors when they decide abstention issues. *See, e.g., Westport Ins. Corp. v. Warner,* 2001 U.S. Dist. LEXIS 13684, \*4-5 (E.D.La.2001); *WTA Marine, L.L.C. v. Antin-Quealy, Inc.,* 1999 U.S. Dist. LEXIS 10730, \*4-5 (E.D.La.1999); *St. Paul Reinsurance Co. v. Iberic Int'l, Inc.,* 1999 U.S. Dist. LEXIS 13029, \*4-6 (E.D.La.1999); *Scottsdale Ins. Co. v. Bayou Land and Marine,* 1999 U.S. Dist. LEXIS 15561, \*17-18 (E.D.La.1999). Further, the Fifth Circuit does not appear to have abandoned the *Travelers* factors. *See, e.g., Orix Credit*

*Alliance v. Wolfe,* 212 F.3d 891, 895 (5th Cir.2000); *Agora,* 149 F.3d at 373. Accordingly, using the *Travelers* rubric, the Court will consider both the *Wilton* and *Travelers* factors.

First, all of the issues in the declaratory judgment action can be resolved in the pending state court proceeding in which the Holleys are defendants and Colony is a third-party defendant. The Holleys filed a third-party demand against Colony, which involves the same coverage dispute that is at issue here. (*See* Third Party Demand Against Colony Insurance, attached to Defs.' Mot. to Dismiss, Ex. E; Pl.'s Compl. for Declaratory Judgment.) Parallel proceedings in two courts under these circumstances invite inconsistent policy interpretations and piecemeal litigation. Moreover, the issues involved in Colony's declaratory judgment action are state law issues, which are particularly suited for resolution by the state court.

*\*3* Colony's reliance on *Agora Syndicate, Inc. v. Robinson Janitorial Specialists, Inc.,* 149 F.3d 371 (5th Cir.1998) is misplaced. In *Agora,* the Fifth Circuit reversed the district court's dismissal of a declaratory judgment action for several reasons that are not present here. The declaratory plaintiff was not a party to the state court suit, and the district court incorrectly found it sufficient that the declaratory plaintiff could intervene in the state court proceeding. *See Agora,* 149 F.3d at 373. Further, the Fifth Circuit found that, because the parties had fully briefed the merits of the case and had conceded that there were no factual disputes, abstention would be wasteful. *See id.* None of these facts are present in this case. Moreover, the *Agora* court stated that these were "unusual circumstances" and that usually a district court's finding that some of the *Wilton/Travelers* factors have been met would not be reversed for abuse of discretion. *See id.* at 373-74.

Further, because Colony had already denied the Holleys' request for a defense and coverage when it filed this declaratory judgment action, it appears that Colony's filing was in anticipation of being sued by the Holleys. Colony does not suggest anything different. Finally, although this Court is probably as convenient a forum as the state court, that factor alone does not outweigh the other factors favoring abstention. Accordingly, abstention is the proper course here.

The Supreme Court has noted that "where the basis for declining to proceed is the pendency of a state proceeding, a stay will often be the preferable course, because it assures that the federal action can proceed without risk of a time bar if the state case, for any reason, fails to resolve the matter in

controversy." *Wilton,* 515 U.S. at 288 n. 2, 115 S.Ct. 2143 n. 2; *see also Melancon v. Union Carbide Corp.,* 1998 U.S. Dist. LEXIS 3683, 1998 WL 122610, *7 (E.D.La.1998). Thus, the Court finds that a stay, rather than dismissal, is the appropriate method for exercising its discretion to abstain in this case. Ultimately, this Court grants a stay because the state court can comprehensively resolve all of the state law coverage issues in a forum that is just as convenient as this one. Litigation in one forum will prevent unnecessary duplication of judicial effort and prevent inconsistent policy interpretations.

### III. Conclusion

For the reasons set forth above, this case is STAYED pending resolution of the consolidated cases of *Muscarello and Hecker v. Garitty and Holley et al.* in the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana, No.2001-13146, Division "D", and *Muscarello and Hecker v. Garitty and Holley et al.* in the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana, No.2001-13665, Division "A."

**End of Document**

© 2010 Thomson Reuters. No claim to original U.S. Government Works.

Unpublished Disposition

178 F.3d 1295

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.) United States Court of Appeals, Sixth Circuit.

LOUISVILLE COUNTRY CLUB, a Kentucky Corporation on behalf of itself and all its members; et al., Plaintiffs-Appellees, Cross-Appellants,

v.

Beverly L. WATTS, in her official capacity as Director of the Kentucky Commission on Human Rights; et al., Defendants-Appellants, Cross-Appellees.

No. 97-5758, 97-5829.    April 16, 1999.

On Appeal from the United States District Court for the Eastern District of Kentucky.

Before KEITH, MERRITT, and NORRIS, Circuit Judges.

Opinion

## OPINION

PER CURIAM.

*1 In 1991, the Reverend Louis Coleman filed a complaint with the Kentucky Commission on Human Rights ("KCHR") alleging that plaintiffs in this cause, the Louisville Country Club, the Idle Hour Country Club, and the Pendennis Club, Incorporated, denied him membership because of his race. The complaints alleged violations of Ky.Rev.Stat. Ann. § 344.120 (Banks-Baldwin 1999) and § 141.010(11) & (13)(f). Section 344.120 prohibits racial discrimination by certain types of organizations, while § 141.010 forbids tax deductions for organizations that discriminate. The KCHR later determined that it lacked jurisdiction over plaintiffs because they were private social clubs as defined by § 344.130.

At the request of a State General Assembly Representative, the Kentucky Attorney General reviewed the KCHR's interpretation of its jurisdiction. The Attorney General disagreed with the KCHR's interpretation, concluding that the KCHR's authority to investigate whether an organization had racially discriminated for purposes of the tax statutes is not limited by § 344.130. Subsequent to the Attorney General's opinion, then-Commissioner Mae Cleveland filed identical "commissioner-complaints" against plaintiffs, and the KCHR began an investigation of the matter.

In May, 1995, plaintiffs filed suit in federal district court against the KCHR and its Commissioners pursuant to 42 U.S.C. §§ 1983 and 1988, seeking a declaration either that the implementation of a Kentucky anti-discrimination tax law violated plaintiffs' First Amendment rights of free association or that the KCHR had exceeded its statutory authority in investigating plaintiffs. Plaintiffs also sought an injunction preventing defendants' investigation and claimed costs and attorney fees pursuant to 42 U.S.C. § 1988.

Defendants moved to dismiss the action. The district court granted the motion with regard to the KCHR itself, finding that it is not a "person" for the purposes of 42 U.S.C. § 1983. The court also dismissed plaintiffs' claims to the extent that they required a ruling on the constitutionality of portions of the Kentucky Revenue Code. However, the court ruled that the Tax Injunction Act does not bar the court's consideration of the limitation imposed by § 344.130 on KCHR's jurisdiction, that it should not decline jurisdiction based upon the abstention doctrine set forth in *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496 (1941), and that it should not certify the statutory interpretation question to the Supreme Court of Kentucky.

The parties then briefed the remaining claims, and the district court entered summary judgment for plaintiffs, ruling that § 141.010 is not a grant of jurisdiction to the KCHR, and thus that the KCHR's jurisdiction in § 141.010 determinations is limited to its authority under § 344.130. Defendants appeal the district court's ruling concerning the Tax Injunction Act, abstention, and certification and the court's grant of summary judgment for plaintiffs. Plaintiffs cross-appeal the district court's dismissal of their claims concerning the constitutionality of the Kentucky tax statutes.

*2 We conclude that the district court improperly adjudicated plaintiffs' claim in light of the abstention doctrine created by *Younger v. Harris,* 401 U.S. 37 (1971), and its progeny. Although neither party argued *Younger* abstention before the district court or on appeal, *Younger* abstention is properly raised *sua sponte* at any point in the appellate process. *Bellotti v. Baird,* 428 U.S. 132, 143 n. 10 (1976); *Federal Express Corp. v. Tennessee Public Serv. Comm'n,* 925 F.2d 962, 966 (6th Cir.1991).

Louisville Country Club v. Watts, 178 F.3d 1295 (1999)

The *Younger* doctrine, in its original form, maintains that abstention is appropriate where federal jurisdiction has been invoked for the purpose of restraining an ongoing state criminal proceeding. *Sun Refining & Marketing Co. v. Brennan,* 921 F.2d 635, 639 (6th Cir.1990). At the heart of *Younger* abstention is the notion of comity, that is, "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger,* 401 U.S. at 44.

In *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423 (1982), the Supreme Court articulated the following three-pronged test for determining when *Younger* abstention is appropriate in noncriminal proceedings: (1) Are there ongoing state judicial proceedings?; (2) Do the proceedings implicate important state interests?; and (3) Is there an adequate opportunity in the state proceedings to raise constitutional challenges? *Id.* at 432. Each of these requirements is met in the instant action.

The proper time from which to judge the applicability of *Younger* abstention is the date at which the federal complaint was filed. *Carras v. Williams,* 807 F.2d 1286, 1290 n. 7 (6th Cir.1986). In the present case, plaintiffs filed suit in hopes of enjoining defendants, an administrative agency and its commissioners, from conducting an official inquiry into alleged civil rights wrongdoing. An administrative agency proceeding such as that brought by the KCHR will be characterized as either judicial or legislative for purposes of the *Younger* analysis depending upon the nature of the final act that the proceeding is designed to produce. *New Orleans Public Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 370 (1989). A proceeding is judicial where it

"investigates, declares and enforces liabilities as they stand on present and past facts and under laws supposed already to exist." *Id.* (quoting *Prentis v. Atlantic Coastline Co.,* 211 U.S. 210, 226 (1908)). Here, KCHR's investigation of plaintiffs is clearly part of a judicial proceeding that will, if fruitful, result in full prosecution of plaintiffs under existing Kentucky civil rights law.

Furthermore, the proceedings against plaintiffs implicate important state interests. *Cf. Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 628 (1986) (finding that "the elimination of prohibited sex discrimination is a sufficiently important state interest" to bring the case within the ambit of the *Younger* precedent).

*3 Finally, plaintiffs have adequate opportunity to challenge the constitutionality of the KCHR proceeding, if not during the administrative proceeding itself, then in a subsequent or even concurrent appeal to the Kentucky courts. *See* Ky.Rev.Stat. Ann. § 344.240(1) (Banks-Baldwin 1999) (providing state judicial review of any final order given by the KCHR); *see also Watts v. Burkhart,* 854 F.2d 839, 848 (6th Cir.1988) (holding that where state administrative proceedings would not afford the opportunity to raise constitutional claims, it is sufficient to satisfy the third prong of *Middlesex* that constitutional claims may be raised upon state court review of the administrative proceeding).

Accordingly, we conclude that, under the circumstances of this case, the district court should have abstained, under the doctrine announced in *Younger,* from asserting jurisdiction over the cause. We therefore vacate the decisions of the district court.

**Parallel Citations**

1999 WL 232683 (C.A.6 (Ky.))

**End of Document**    © 2010 Thomson Reuters. No claim to original U.S. Government Works.